JOSEPH P. BYRNE, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent [1]
Byrne v. Commissioner
Docket Nos. 9464-79; 14086-79; 14087-79
United States Tax Court
T.C. Memo 1982-373; 1982 Tax Ct. Memo LEXIS 376; 44 T.C.M. (CCH) 338; T.C.M. (RIA) 82373; June 30, 1982
Luther J. Avery, Jeffrey S. Ross, and Michele D. Robertson, for the petitioner in docket No. 6464-79. Herman C. Meyer, 1a for the petitioners in docket Nos. 14086-79 and 14087-79. George L. Bevan, Jr., and David L. Denier, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in the Federal income tax of Joseph P. Byrne and Theresa A. Byrne for the calendar years 1972 and 1973 in the amounts of $ 173,944 and $ 40,939, respectively, and additions to tax under section 6653(b) [2] in the amounts of $ 86,972 and $ 20,469.50, respectively. [3] Respondent determined deficiencies in the Federal income tax of Danilo Prodanovich and Barbara Prodanovich for the calendar years 1971, 1972, and 1973 in the amounts of $ 1,804.10, $ 45,346, and $ 461, respectively, and an addition to tax under section 6653(a) for the calendar year 1972 in the amount of $ 2,267.30. [4] Respondent determined a deficiency for the calendar *378 year 1972 in the Federal income tax of Prodanovich, Inc. (a dissolved corporation), in the amount of $ 40,280 and an addition to tax under section 6653(a) in the amount of $ 5,301. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision the following: (1) whether Joseph P. Byrne (petitioner) understated his income tax in the year 1972 by failing to report income he received from Prodanovich, Inc., and in the year 1973 by failing to report income he received from Gary Campagna; (2) whether petitioner is taxable on unexplained bank deposits for each of the years 1972 and 1973; (3) whether a part of the underpayment of income tax by petitioner for each of the years 1972 and 1973 was due to fraud with intent to evade taxes; [5] (4) whether petitioner is collaterally estopped to deny that his Federal income tax returns for each of the years 1972 and 1973 were false and fraudulent; (5) whether petitioners Danilo and Barbara Prodanovich received income in 1972 from Prodanovich, Inc., composed of a $ 55,000 investment in a parcel of land, and a $ 25,000 stock venture investment; (6) whether Prodanovich, Inc., in its taxable years *379 1972 and 1973 had a joint venture with either E. C. Braun Co. (Braun) or Joseph P. Byrne, so that a part of the gross receipts received by it was income to either Braun or Joseph P. Byrne rather than to Prodanovich, Inc.; (7) whether payments made by Prodanovich, Inc., to Joseph P. Byrne during 1972 were nondeductible illegal kickbacks within the meaning of section 162(c)(2); [6] and (8) whether Prodanovich, Inc., is liable for the addition to tax for negligence for the year 1972. *380 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. At the time of the filing of his petition in this case, Joseph P. Byrne resided in Emeryville, California. For the taxable years 1972 and 1973, petitioner and his wife, Theresa Byrne, filed joint Federal income tax returns with the Internal Revenue Service Center, Fresno, California. Petitioners Danilo and Barbara Prodanovich (sometimes referred to as the Prodanoviches) resided in Oakland, California, at the time of the filing of their petition in this case. The Prodanoviches filed joint Federal income tax returns for the calendar years 1971, 1972, and 1973. Prodanovich, Inc. (now dissolved), was incorporated under the laws of California and during the years 1970 through 1973 had its principal place of business in Oakland, California. Prodanovich, Inc., filed corporate Federal income tax returns for the calendar years 1970, 1971, 1972, and 1973 with the Internal Revenue Service Center, Fresno, California. Petitioners Danilo and Barbara Prodanovich owned all of the outstanding stock of Prodanovich, Inc., during all times here material. During all times here relevant, petitioner Joseph *381 P. Byrne was president and general manager but not a stockholder of Braun, a mechanical and plumbing contractor, with its place of business located on 81st Avenue in Oakland, California. From the latter part of 1971 through the year 1973, Prodanovich, Inc., was occupying on a monthly rental basis office space in the rear portion of the Braun yard. Prodanovich, Inc., was engaged in underground pipeline construction work and was licensed as a contractor by the State of California. Prior to 1972, Danilo Prodanovich as the president of Prodanovich, Inc., had some business dealings with Mr. Byrne in connection with subcontracts that Prodanovich, Inc., performed for Braun. Sometime in September 1971, Mr. Byrne approached Mr. Prodanovich and discussed with him a concept he had for organizing a construction management company. Mr. Byrne asked Mr. Prodanovich whether Prodanovich, Inc., would be interested in being a part of such an organization. Two or three weeks after this conversation, Mr. Byrne approached Mr. Prodanovich to discuss whether Prodanovich, Inc., would be interested in working on a project known as the Vallejo Project. The conversation between Mr. Byrne and Mr. Prodanovich *382 took place in the rear of the Braun yard. Mr. Byrne specifically asked Mr. Prodanovich if Prodanovich, Inc., would be interested in the contract for the underground pipeline construction work on the project. There was also some discussion about a cost estimate for the project and the procuring of a sketch of the project for Mr. Prodanovich. Subsequently, Mr. Prodanovich was furnished with a rough, preliminary cost estimate of the project made from rough plans and information which had been obtained from Mr. Byrne. The Vallejo Project was a project on a tract of land owned by the Stewards Security, Inc. (SSI), a nonprofit California corporation which administers the pension and welfare benefit plan for the union members of the Marine Cooks and Stewards Union of San Francisco. SSI owned a tract of land in Vallejo, California, which was commonly referred to as the Hunter Ranch. Sometime prior to 1971, the SSI trustees decided to develop the Hunter Ranch property by construction of a convalescent hospital and retirement community for union members and their families. However, before this construction could begin, it was necessary to provide underground sewer lines up to the property *383 by constructing three pipelines from existing sources across adjoining public and private property up to the Hunter Ranch line. A contract was entered into by the City of Vallejo, the Vallejo Sanitation and Flood Control District, and SSI whereby the Hunter Ranch property was annexed by the city and rezoned, forming a special municipal assessment district. SSI was to pay the cost of construction of the pipelines and as security for SSI's payments of these costs interest-bearing municipal bonds were issued to SSI. After completion of the pipelines, persons connected to a pipeline would be assessed by the city and the assessment used to retire the bonds issued to SSI. The affect of the arrangement was that SSI would finance the construction of the pipelines and would be reimbursed for the cost of such construction as the bonds were retired. Because of these financing arrangements, the public had a direct financial interest in the conduct of the project. SSI entered into a contract with Bay Area Management Company, Inc. (BAMCO), to manage the construction of the pipelines for SSI. BAMCO was a corporation formed by Mr. Byrne, Grady McIlroy, who had died prior to the trial of this *384 case, and an architect named Vincent Pelfini. BAMCO was formed to engage in the business of construction management and business consulting. It was specifically formed for the purpose of managing the Vallejo construction project for SSI. Mr. Byrne had first approached Mr. Pelfini about forming BAMCO and told Mr. Pelfini at the time that BAMCO would probably get the contract with SSI. An attorney who had formerly been counsel for Braun and for Mr. Byrne was retained to do the necessary legal work to incorporate BAMCO. Mr. McIlroy was the president of BAMCO and Mr. Byrne was vice president and chairman of the board. At the time BAMCO was formed, Mr. Byrne, Mr. McIlroy, and Mr. Pelfini each owned one-third of the BAMCO stock. However, Mr. Byrne bought out Mr. Pelfini's interest sometime prior to June of 1972 and in May or June 1973 bought Mr. McIlroy's stock and became the sole owner of BAMCO. Before the actual incorporation of BAMCO on November 2, 1971, the principals of BAMCO and SSI had reached an agreement that BAMCO would act as the agent for SSI in the design and development of the Hunter Ranch property in consideration of a fee of 2-1/2 percent of the total project costs. *385 A written agreement to this effect was signed on November 8, 1971. Mr. Campagna was employed as general manager of BAMCO on November 15, 1971. He had been engaged prior to this time in the field of cost estimating. From November 1971 to March 1973, the offices of BAMCO were located in the suite of offices on Edgewater Drive in Oakland, California, where Mr. McIlroy had an office for his business which was known as McIlroy Associates. Mr. Campagna and Mr. McIlroy had adjoining offices at the Edgewater Drive building in Oakland, California. In March 1973 BAMCO and Mr. Campagna moved their offices to the offices of Braun in Oakland, California. The property on 81st Avenue in Oakland in which Braun's offices were located was, in 1971, and still is, owned jointly by Mr. Byrne, Ed Turner, Gerald Posner, and Fran Gardner. Mr. Turner, during all times here relevant, was an official of the Marine Cooks and Stewards Union and a trustee of SSI. Mr. Posner was treasurer and an employee of SSI. Mr. Byrne had known both Mr. Posner and Mr. Turner for many years prior to 1971. Mr. Byrne and Mr. Posner grew up together in the Richmond District of San Francisco. They were both members of *386 the Olympic Club and played golf together at that club. In 1969, Mr. Byrne, Mr. Posner, and Mr. Turner, along with Mr. Gardner, had acquired the property on which Braun's offices were located. In 1971, Mr. Byrne and Mr. Posner together purchased a condominium at the Silverado Country Club in Napa, California. In 1972, Messrs. Byrne, Posner, and Turner together purchased commercial property in San Leandro, California. In August 1972, Mr. Byrne and Mr. Turner together purchased commercial property located on Doolittle Drive in San Leandro, California. Sometime in the early 1970's, Mr. Byrne permitted his name to be put on a deed for a house in San Francisco at the request of Mr. Turner. Mr. Prodanovich had never met Mr. Turner nor Mr. Posner until the time of the groundbreaking for the Vallejo Project in late March 1972. After the signing of the contract between SSI and BAMCO in November 1971, officials of BAMCO began to arrange for the services of an independent civil engineering firm in Vallejo, California, owned by Edward P. Schwafel in connection with the project. A final agreement was reached in December 1971 whereby BAMCO engaged Mr. Schwafel to be the project engineer *387 for the sewer line construction project referred to as the Vallejo Project. Prior to this time Mr. Schwafel had not met Mr. McIlroy, Mr. Campagna, or Mr. Byrne. However, he had done work on the Hunter Ranch property for several years prior to 1971. He had been retained by SSI in 1964 to establish the exterior boundary of the Hunter Ranch and in following years he had prepared certain preliminary water studies for SSI and a preliminary analysis in connection with placing sewers on a portion of the Hunter Ranch property. The primary responsibility of Mr. Schwafel in connection with the Vallejo Project was to obtain the necessary approval of local and Federal Government officials for the pipelines which were to cross a dam, county-owned fairgrounds, and an interstate highway, and to prepare cost estimates for each of the two phases of the pipeline construction. The two phases of construction were referred to as "Line A" and "Lines B and C." Construction on Line A was to be commenced first, and later Lines B and C were to be constructed. Line A of the project required digging through an abutment of a dam owned by the City of Vallejo, parallel to a municipal golf course, through the *388 horse barn area of the county fairgrounds, across a race track, and underneath an interstate highway. In order to place the sewer line across these properties, it was necessary to obtain the approval of the Federal Bureau of Public Roads (because of the crossing of the interstate highway), the City of Vallejo, the Vallejo Sanitation and Flood Control District, the county fair association, and the board of supervisors of Solano County, as well as the golf club and recreation district and the California Department of Water Resources. Mr. Schwafel's first cost estimate for Line A of the construction project was $ 565,815. He notified BAMCO of this estimate sometime between January 14 and January 24, 1972. The initial cost estimate for Line A of $ 565,815 included profit and overhead for the contractor. It was prepared to represent the amount that should be bid for the project. The estimate was made on an item-by-item basis. After Mr. Prodanovich received the rough sketches of the project following his discussion with Mr. Byrne, he had come up with a figure of somewhat over $ 500,000 as a ballpark estimate of the cost of Line A of the project. Mr. Prodanovich never had any contact *389 with either Mr. McIlroy or Mr. Pelfini about the Vallejo Project prior to March 1972. After Mr. Schwafel furnished BAMCO with his estimate of $ 565,815 for Line A of the project in January 1972, Mr. McIlroy asked Mr. Campagna to verify Mr. Schwafel's estimate. Mr. McIlroy stated to Mr. Campagna that he was concerned about the amount of money that might be bid for the project and he wanted to be sure how much over a reasonable estimate the bid would be. Mr. Campagna then conducted an independent estimate of the cost of construction of Line A and determined that the value of the job was between $ 550,000 and $ 575,000. In connection with making this estimate, Mr. Campagna contacted several licensed contractors whose names had been given to him by Mr. Schwafel and furnished these contractors with the specifications for Line A. The contractors visited the worksite with Mr. Campagna and Mr. Campagna assembled the information with respect to the cost the various contractors estimated they would charge for the work on a worksheet. After Mr. Campagna had made his estimate and given the information to Mr. McIlroy, he was in Mr. McIlroy's office while Mr. McIlroy was talking with Mr. Byrne. *390 Mr. McIlroy said into the telephone, "Say this to him, he is sitting right here," and handed the telephone to Mr. Campagna. Mr. Byrne was on the line and he told Mr. Campagna that he thought Mr. Schwafel's estimate was low and that an estimate of $ 750,000 would be a more accurate appraisal of the cost of Line A. Mr. Campagna started to discuss with Mr. Byrne the estimate he had made and Mr. McIlroy indicated to him not to say anything to Mr. Byrne about his estimate. Mr. Byrne told Mr. Campagna to have Mr. Schwafel contact Bill Dove, an estimator for Braun, and review some of the cost criteria that he believed Mr. Schwafel had not included in his estimate. Mr. Campagna was also instructed by Mr. McIlroy to tell Mr. Schwafel and his staff that Mr. Schwafel's estimates were obviously optimistic and had not taken into consideration various code and safety requirements pertaining to the sewer line. In the latter part of January 1972, Mr. Byrne talked to Mr. Schwafel several times on the telephone and in each instance indicated to Mr. Schwafel that he did not believe his estimate of a cost of $ 565,815 for Line A took into consideration the cost of the two or three very expensive portions *391 of the project and that in his view a more realistic cost would be somewhere between $ 700,000 to $ 740,000. During one of these conversations, Mr. Byrne told Mr. Schwafel that the total budget for Line A would be in the range of $ 850,000 and on another occasion that a budget of $ 830,000 was going to be established. During a conversation in late January 1972, Mr. Byrne told Mr. Schwafel that March 8, 1972, was the target date to have all the engineering plans finished and approved by the necessary agencies. In early February, Mr. Byrne called Mr. Schwafel and told him to proceed to plan for Lines B and C and to have all of the plans and specifications for Line A completed and approved by March 1, 1972. Around February 10, 1972, Mr. Prodanovich came up with a final cost estimate for Line A of $ 681,000. This cost estimate included the construction cost, a 10 percent overhead cost, a 10 percent profit, and a 1 percent cost for the premium for a surety bond. In the latter part of February 1972, Mr. Prodanovich told Mr. Byrne the amount of his final cost estimate. March 10 was set for the date for opening of bids. Approximately a week or 10 days prior to March 10, 1972, Mr. Prodanovich *392 and Mr. Byrne discussed a list of potential bidders for the Vallejo Project. Mr. Byrne had a list of potential bidders in his possession during the discussion. Previously Mr. Schwafel had been asked by Mr. Campagna to furnish a list of contractors to receive invitations to bid on Line A, but Mr. Schwafel had not furnished the list of names and never did furnish it. Mr. Campagna saw a list of bidders for Line A for the first time at the bid opening on March 10 when Mr. Byrne handed out copies to everyone. Mr. Campagna had not suggested any of the companies on the list. Mr. Schwabel, who was at the opening of the bids, was also handed one of the composite list of names. This list had been prepared by names suggested by Mr. Byrne and Mr. Prodanovich. The names on the list were not businesses currently engaged in underground construction or were companies that did not do construction projects as large as the Vallejo Project. On March 9, Mr. Schwafel was instructed in a telephone conversation with Mr. Campagna that the bidding be changed from unit prices to lump sum bidding. Mr. Schwafel objected to making the change because, in his opinion, a lump sum bid would be very difficult *393 to administer. Also, Mr. Schwafel had prepared two addenda with respect to Line A which had been hand delivered to Mr. Byrne's office on March 8. Mr. Schwafel never received any telephone calls or inquiries from anyone regarding the changes made by the addenda. On March 10, at the bid opening, bids were received in the names of six different companies, one of which was Prodanovich, Inc., and one Braun. The Prodanovich, Inc., bid, which was the low bid, was in the amount of $ 757,387. At the time the bids were open, Mr. Byrne said that Braun's bid had been put in as a protective bid for SSI in case there were no lower bids. All the bids, except the Prodanovich, Inc., and Braun bids, were actually prepared in the offices of Prodanovich, Inc. Les Ferrari, who was employed by Prodanovich, Inc., as a construction superintendent, prepared some of the bids and Mr. Prodanovich prepared others. On March 23, 1972, Prodanovich, Inc., and BAMCO, as the agent for SSI, entered into a written contract for the construction of Line A for a lump sum contract price of $ 757,387. In February 1972, Mr. Prodanovich had looked into obtaining a bond for the Vallejo Project for Prodanovich, Inc. Because *394 of other ongoing projects, he discovered that his company did not have sufficient bonding capacity to handle the Vallejo Project. In the latter part of February 1972, Mr. Prodanovich informed Mr. Byrne of the problem he was having obtaining a bond for the Vallejo Project. Mr. Prodanovich then discussed the possibility of Braun supplying the necessary bonding for the job. Mr. Byrne and Mr. Prodanovich discussed the terms of a possible joint venture whereby Braun would supply the necessary bonding, and profit from the job would be split evenly. On March 14, 1972, Mr. Prodanovich and Mr. Byrne executed a document entitled "Joint Venture Agreement" on behalf of Prodanovich, Inc., and E. C. Braun Co. This agreement provided as follows: THIS AGREEMENT is executed as of 14 March 1972, between PRODANOVICH INC. and E. C. BRAUN INC. both of Oakland, California. NOW, THEREFORE, IT IS AGREED THAT: 1. The parties hereto do hereby associate themselves together as Joint Venturers and do hereby form a Joint Venture to perform the contract work as may be obtained from BAMCO, agents for Security Inc., for the improvement of their development project located in Vallejo, California in the *395 vicinity of Interstate Highway 580 and Columbus Parkway. IT IS AGREED THAT, all contracts be satisfactory to each of the parties and all transactions made in behalf of the Joint Venture shall be the joint and several obligations of each of the parties hereto. Each of the parties hereto does hereby jointly and severally appoint and constitute Danilo Prodanovich and Prodanovich Inc. to act severally as their true and lawful attorneys-in-fact, with full power and authority for and on behalf of the Joint Venture, to execute and submit any and all documents which may be necessary or desirable to be submitted in connection with fulfilling the management of business transactions. The respective interest of each of the parties, under this agreement, is as follows: PRODANOVICH INC.
50%
E. C. BRAUN
50%
Each party shall furnish in accordance with the above percentages its respective share of any deposits, bonds or other security in connection with the bid and the award of the Contract pursuant thereto. In the event the additional bids contemplated by this agreement are successful and the Contract is awarded to the parties hereto, each such party shall promptly enter *396 into a Joint Venture agreement covering the performance of the Contract and more fully defining the rights, liabilities and interest of the parties and providing among other things that: (a) Prodanovich Inc. shall be the "sponsor" or managing director of the work to be performed under the Contract and of the Joint Venture formed under such agreement. (b) The interest of the parties in and to the performance of the Contract, in and to any and all property, materials, and equipment acquired in connection therewith, and in and to any profits derived therefrom and any liabilities for losses incurred in connection therewith shall be respective percentages set forth in previously stated amount as shown in Section 1. of this document. (c) All necessary working capital, when and as required for the performance and prosecution of the Contract shall be furnished by the parties hereto proportionately in accordance with their respective interest herein set forth. No other written agreements were executed with respect to a construction joint venture between Prodanovich, Inc., and Braun. The contract for Line A was not assigned to the "joint venture." There was no subcontract between *397 the "joint venture" and Prodanovich, Inc., providing for Prodanovich, Inc., to do the actual work on Line A. On March 14, Mr. Byrne signed on behalf of Braun an Indemnity Agreement with Fireman's Fund which was the performance bond for Line A. Prodanovich, Inc., had never had a joint venture job with Braun prior to March 1972 but had many earlier joint ventures with another business. In the earlier joint ventures, a separate bank account was opened in the name of the joint venture, a Federal return of partnership income was filed in the name of the joint venture, separate ledger pages were set up on the books of Prodanovich, Inc., for the joint venture, and the accountant for Prodanovich, Inc., was aware of the joint venture. Records were separately kept for the joint venture and payment made by check with respect to amounts due the joint venturer. On the Vallejo Project there were no joint venture bank accounts, no joint venture returns were filed, no joint venture ledger pages were on the books of Prodanovich, Inc., and the attorney and accountant for Prodanovich, Inc., were not informed that any joint venture existed. There was no approval by the board of directors of Prodanovich, *398 Inc., of any joint venture to be conducted with Braun and there was no approval of any such joint venture by the board of directors of Braun. No joint venture license for the Vallejo Project was ever obtained. Mr. Schwafel, in accordance with directions which had been given him by Mr. Byrne, proceeded to make an estimate for construction costs for Lines B and C and on March 17, 1972, submitted to BAMCO his initial cost estimate for the construction of Lines B and C of $ 473,511. Mr. Schwafel increased this estimate to $ 557,695, just prior to the bid opening for Lines B and C, on May 10, 1972. The increase was made as a result of discussions between Mr. Schwafel and Mr. Dove. A notice to bidders for Lines B and C was prepared by BAMCO but was never mailed to any prospective bidders. Bids in the names of other companies were prepared in connection with Lines B and C in the same manner as had been done in connection with Line A. On May 16, 1972, bids for Lines B and C were opened by Mr. Schwafel at BAMCO's office. Many of the bids submitted lacked the required bid documents, as had been the situation with the bids submitted in connection with Line A. When the bids were open *399 Prodanovich, Inc., was the low bidder with a bid of $ 513,000. On May 24, 1972, Prodanovich, Inc., and BAMCO, as agent for SSI, entered into a contract for the construction work on Lines B and C. Prodanovich, Inc., commenced the construction on the Vallejo Project at the end of March 1972 and thereafter submitted monthly invoices to BAMCO for progress payments on the underground pipeline construction. Mr. Schwafel's approval was required for each project payment and he was urged by Mr. Campagna to rush his approval. Mr. Campagna told Mr. Schwafel that the reason for rushing his approval was that Prodanovich, Inc., needed working capital. Mr. Byrne had promised Mr. Prodanovich that he would expedite the payment of each monthly invoice. The first invoice submitted by Prodanovich, Inc., on March 31, 1972, was for $ 96,500. It received $ 86,850 on April 5, 1972. It was customary to withhold 10 percent of each project payment until the project was completed and the job was accepted. However, the invoice submitted on March 31, 1972, was substantially in excess of the actual work that had been performed up to that point. The next progress payment received by Prodanovich, Inc. *400 , was in the amount of $ 139,795, which was received on May 1, 1972. Thereafter, at the end of each month Prodanovich, Inc., submitted invoices to BAMCO with respect to the Vallejo Project and received progress payments of 90 percent of the monthly invoices. After the submission of the last invoice and approval of the project, Prodanovich, Inc., received all of the withheld 10 percent except $ 15,000 which was retained by BAMCO until minor final work was done. During the period from April 5, 1972, through November 6, 1972, BAMCO paid to Prodanovich, Inc., in connection with work done on Line A and Lines B and C on the Vallejo Project a total of $ 1,257,392. On June 22, 1973, Prodanovich, Inc., received its final payment from BAMCO for the construction work in connection with the Vallejo Project in the amount of $ 15,000. Prior to the time that Prodanovich, Inc., received its first progress payment, there had been an agreement made between Mr. Prodanovich and Mr. Byrne that part of the funds received in each payment would be turned over to Mr. Byrne. It had been discussed between Mr. Byrne and Mr. Prodanovich that the project should generate sufficient profit that there would be *401 10 percent for Mr. Byrne and 10 percent for Prodanovich, Inc., in addition to the 10 percent for overhead and the 1 percent for the bond. However, before the first payment came in Mr. Byrne had told Mr. Prodanovich that he would need money right away to use in promoting business and perhaps to obtain a third job which would be bigger than the other two jobs. Mr. Byrne and Mr. Prodanovich discussed the possibility of the final job being in the amount of $ 5 million to $ 10 million worth of work. Mr. Byrne and Mr. Prodanovich had also discussed the necessity of some of the payments to Mr. Byrne being made in cash, and Mr. Prodanovich had agreed to make cash payments. Mr. Prodanovich made payments beginning in April 1972 by cashier's checks to Mr. Byrne and then in the latter part of June,Mr. Byrne suggested to Mr. Prodanovich that it might be well if he gave a check to Prodanovich, Inc., and marked the check as a loan and then Prodanovich, Inc., could give a check to Mr. Byrne shortly thereafter in the amount of the check which Mr. Byrne had given to Prodanovich, Inc., plus an additional amount. The following schedule shows the date, amount, and type of checks issued by Prodanovich, *402 Inc., to Mr. Byrne: Date
Amount
Type of Payment
April 7, 1972
$ 10,000
Cashier's check
May 3, 1972
$ 10,000
Cashier's check
June 1, 1972
$ 5,000
Cashier's check
June 2, 1972
$ 19,000
Check
July 10, 1972
$ 50,000
Check
August 7, 1972
$ 50,000
Check
September 8, 1972
$ 25,000
Check
November 7, 1972
$ 20,000
Cashier's check
Total
$ 189,000
The following schedule shows checks issued by Mr. Byrne to Prodanovich, Inc., and the amounts of such checks: Date
Amount
June 26, 1972
$ 40,000
July 20, 1972
$ 40,000
August 31, 1972
$ 25,000
Total
$ 105,000
In addition to the $ 189,000 in checks and cashier's checks paid to Mr. Byrne by Prodanovich, Inc., the corporation in May 1972 paid $ 2,200 on behalf of Mr. Byrne to purchase an automobile for Mr. Byrne's son and paid $ 1,400 in June 1972 to a furniture dealer to purchase furniture for Mr. Byrne's office. Mr. Prodanovich did not intend these amounts to be gifts to Mr. Byrne or Mr. Byrne's son from himself or Prodanovich, Inc. Mr. Byrne had also made it clear to Mr. Prodanovich prior to the time Mr. Prodanovich received the first *403 progress payment in April 1972 that he would need payments made to him in cash. It was understood that Mr. Byrne would receive cash payments in an approximate amount of 20 percent of each progress payment. Mr. Prodanovich understood that some of this cash was needed by Mr. Byrne for the purpose of making arrangements for Prodanovich, Inc., to receive a large contract. Mr. Prodanovich understood that some of the cash was for "the boys" or for "greasing the skids." Mr. Prodanovich, on a number of occasions, requested various individuals to assist him in obtaining cash and, when he would ask these individuals to cash checks for him or assist him in cashing checks, he would tell them that he needed the cash to deliver to Mr. Byrne and at times would refer to the need for money "for the boys" or for "greasing the skids." Mr. Prodanovich considered that part of the cash he delivered to Mr. Byrne was merely an advance and that at some time there would be an accounting as to the profit on the project. In order to raise cash to give to Mr. Byrne, Mr. Prodanovich got various individuals to cash checks for him, some of them at Lake Tahoe gambling casinos and some at other places. In order *404 to put funds aside from which to be able to cash these checks, Mr. Prodanovich instructed his attorney, John Crvarich, to open trust accounts to keep the Vallejo Project funds separate from the rest of his business funds. Mr. Prodanovich told Mr. Crvarich that large checks would be cashed because, from time to time, he would need large sums of cash which he said would be for the purpose of buying equipment. George Kojovich was the office manager for Prodanovich, Inc. During the period when Prodanovich, Inc., was working on the Vallejo Project, Mr. Prodanovich had Mr. Kojovich maintain an accounting on long sheets of paper of the receipts and disbursements of payment received from the project. The record showed the amount taken in, and then 70 percent of that amount would be shown as the amount to be turned over to the bookkeeper who kept the regular set of books for Prodanovich, Inc. The 70 percent of actual receipts was the amount shown as the receipts from the project on the regular records of Prodanovich, Inc. The other 30 percent was set aside for the purpose of raising cash when necessary. Mr. Prodanovich himself also kept a record of the total receipts from the project *405 and the various disbursements of cash from the 30 percent that was not shown on the regular record of Prodanovich, Inc., as received from the project. Starting in April 1972, Mr. Prodanovich delivered envelopes containing cash to Mr. Byrne. The first envelope contained $ 20,000 in cash and envelopes delivered thereafter contained varying other amounts of cash. The total amount of cash delivered in this manner by Mr. Prodanovich to Mr. Byrne during the period April 5, 1972, through November 1972 was $ 204,000. In mid-June 1972, Mr. Prodanovich met with Mr. Byrne in Mr. Byrne's office, at which time Mr. Byrne gave Mr. Prodanovich an accounting of payments which had been received by Mr. Byrne from Mr. Prodanovich up to that point. Mr. Byrne had a piece of paper on his desk to which he would refer to transpose numbers to another piece of paper on his desk. The piece of paper to which the numbers from the paper on Mr. Byrne's desk were transposed set forth Mr. Byrne's accounting for the moneys received from Mr. Prodanovich. After the figures were placed on the piece of paper, Mr. Byrne gave the paper to Mr. Prodanovich, and Mr. Prodanovich kept that piece of paper in his wallet *406 until he turned it over to agents of the Internal Revenue Service in 1974. The figures shown on the piece of paper which were in Mr. Byrne's handwriting were as follows: $ 19,000 25,000 2,200 32,000 5,000 19,000 1,400 $ 103,600 At the bottom of the page, in Mr. Byrne's handwriting, was the following information: Offsite
--
$ 160,000
Onsite
--
84,000
$ 244,000
On this piece of paper, Mr. Prodanovich put a question mark after the first figure of $ 19,000. He told Mr. Byrne that the first amount delivered to him was $ 20,000, but Mr. Byrne insisted it was only $ 19,000. After Mr. Prodanovich received this paper he drew a circular line around the figures appearing after Offsite and Onsite and put lines underscoring the 160 figure appearing in the $ 160,000 figure and the $ 244,000 figure. He also wrote some other figures below the circle. In the latter part of 1972 when Prodanovich, Inc., began to have cash flow problems, Mr. Prodanovich discussed with Mr. Byrne returning some of the money that had been advanced to him and Mr. Byrne told Mr. Prodanovich that these moneys had been put into property that Mr. Byrne owned jointly *407 with Gerald Posner and Ed Turner. Later, Mr. Crvarich volunteered to talk to Mr. Byrne on behalf of Mr. Prodanovich about Mr. Byrne's returning some of the cash advanced to him. Mr. Crvarich went to Mr. Byrne's office and,in the presence of Mr. Campagna, Mr. Crvarich told Mr. Byrne that Mr. Prodanovich had given him (Mr. Byrne) a lot of money, much of it in cash, and that he understood the total amount was in excess of $ 260,000. Mr. Crvarich stated that Mr. Prodanovich needed some of the money back. Mr. Byrne looked at Mr. Crvarich and said "That would be hard to prove." In the latter part of January or possibly early in February 1972, Mr. McIlroy told Mr. Campagna that a way should be found to put into the monthly BAMCO invoices to SSI an amount of money in excess of the amount of the invoice submitted to BAMCO by all suppliers of projects and services on the Vallejo Project,except Prodanovich, Inc., equal to 10 percent of the bottom line figure on the invoice. Thereafter, on a monthly basis until October 1972, Mr. Campagna prepared invoices for BAMCO for billing to SSI and inflated the amount by increasing the expenses shown as incurred from one or more of the subcontractors. *408 Mr. Campagna,accompanied by Mr. McIlroy, or on occasions by Mr. Pelfini or Mr. Byrne, would present the inflated invoices to SSI for payment through Mr. Posner. After SSI paid BAMCO, and BAMCO paid the subcontractors, Mr. Campagna collected the 10 percent inflated amount from the subcontractors and delivered the amount in currency to Mr. McIlroy. Some invoices carrying the additional 10 percent were prepared or altered at BAMCO's office, but these invoices had the appearance of being an invoice to BAMCO from the subcontractors and the altered or false invoices were submitted to SSI to accompany BAMCO's invoices to SSI. In October 1972, Mr. Campagna had surgery and was in the hospital for several weeks. When he returned to work in November 1972, Mr. McIlroy told him to abandon the 10 percent formula and to simply inflate the BAMCO statement to SSI by figures which would be provided to him by Mr. McIlroy. This arrangement with Mr. McIlroy continued until March 1973 when BAMCO's office and operations were moved to the premises of Braun. Some of the inflated invoices on the stationery of subcontractors were actually prepared in BAMCO's office. Each month after the inflated invoices *409 on the stationery of the subcontractors had been made and a draft of BAMCO's invoice to SSI was ready, Mr. Campagna would hand Mr. McIlroy a rough penciled draft and Mr. McIlroy would tell Mr. Campagna that he was leaving the office to show the invoice to Mr. Byrne and get his approval. Some of the inflated invoices were invoices from Mr. Schwafel. The system used would be to set up an associate's fee account for billing even though the associate had done no work on the project. Other invoices were invoices of E. G. Craig, who was an architect and planner engaged by BAMCO on the Vallejo Project in 1972. Some of the false or inflated invoices from Mr. Craig were prepared in Mr. Craig's office and some in BAMCO's office, but they were always on Mr. Craig's stationery. Sometimes Mr. Craig submitted invoices for the correct amount of his services, but would receive a check larger than the invoice with telephone instructions from Mr. Campagna as to where to send the excess payment. Mr. Craig first gave the excess payments to Mr. McIlroy and later gave the excess payments to Mr. Campagna. After the offices of BAMCO were moved to the Braun offices in February or March of 1973, Mr. *410 Campagna received all of his instructions from Mr. Byrne. Beginning in June 1973, Mr. Campagna gave most of the cash generated by the false invoices to Mr. Byrne. In many instances when the false or inflated invoices were submitted, a check would be drawn directly to the individual that had rendered the services such as Mr. Schwafel or Mr. Craig and the check would be deposited in the account of the person who had rendered the services. A check would then be drawn on the account of the person who had rendered the services either to Mr. Campagna or to some other individual. These checks would be cashed and, if the check was not drawn to Mr. Campagna, the cash would be turned over to him. In some instances, a cashier's check would be given to Mr. Campagna and he would cash it. After June 1973, in a number of instances Mr. Byrne told Mr. Campagna the figures to put on certain invoices. During this period of time, since Mr. Campagna was in the office adjoining Mr. Byrne, he and Mr. Byrne would have discussions on a regular basis of the amount that could be added to the invoices and about the difficulty of getting cash for the checks. After June 1973, Mr. Campagna did not give *411 the total amount of the checks generated by the false invoices to Mr. Byrne because on occasions he had expenses when he went to Lake Tahoe to cash checks and on one occasion he took $ 1,500 out of the cash for a political dinner and on another occasion $ 1,000 for a golf tournament. At times Mr. Campagna would take $ 400 or $ 500 out of the cash generated through the false or inflated invoices for other purposes. In January 1974, Mr. Campagna made his last cash payment to Mr. Byrne. This payment consisted of all the cash Mr. Campagna had remaining from the overbillings to SSI. Mr. Campagna gave $ 47,300 of the total moneys received from the false or inflated invoices paid by SSI to BAMCO at the direction of Mr. Posner during the period June 1 through December 31, 1973, to Mr. Byrne. When Mr. Byrne was first interviewed by Internal Revenue agents, he was asked whether he had ever received any currency from Mr. Prodanovich or Prodanovich, Inc., and stated that he had received no such currency. He was asked if he knew of any payments to union officials relative to the Vallejo Project and stated he knew of none. On August 21, 1974, after Mr. Byrne was interviewed relative to the *412 investigation of his Federal tax returns, he called Mr. Prodanovich to advise him that he had been interviewed by the Internal Revenue Service. Mr. Byrne stated to Mr. Prodanovich that they should tell the Internal Revenue Service that the difference in the amounts of the checks given to Mr. Prodanovich by Mr. Byrne and the payments to Mr. Byrne by Prodanovich, Inc., were repayments of cash loans. He also told Mr. Prodanovich that "We have to get our stories together." Thereafter Mr. Byrne was interviewed by revenue agents and special agents of the Internal Revenue Service and an attorney with the Strike Force of the Department of Justice. On several occasions when he was asked if he had ever received any moneys from Mr. Prodanovich, other than in repayment of loans, he stated that he had received no such moneys and that he had received no cash payments from Mr. Prodanovich, Mr. Campagna, or anyone else. In the latter part of 1973, Mr. Campagna and Mr. Byrne had a discussion in Mr. Byrne's office about the possibility of hiring an individual named Abe Chapman to set fire to the offices of Prodanovich, Inc., to destroy his books and records regarding the Vallejo Project. The discussion *413 came about after Mr. Campagna told Mr. Byrne that all the transactions regarding the Vallejo Project were clearly set forth in Mr. Prodanovich's books. Mr. Chapman was contacted by Mr. Campagna in the fall of 1973 and given some money, with the suggestion that perhaps a fire might burn the records of Prodonavich, Inc. However, Mr. Chapman found out that the records of Prodanovich, Inc., were kept in a safe or off the premises of Prodanovich, Inc., and therefore a fire would not destroy them. When Mr. Byrne was first interviewed by a revenue agent and a special agent on August 21, 1974, he was asked to estimate the amount of currency he would have on hand at any one time since December 31, 1969. Mr. Byrne stated that at any one time since December 31, 1969, he would have maintained approximately $ 12,000 to $ 15,000 in currency and would have no more than $ 16,000 of currency on hand at any one time. On August 11, 1977, Mr. Byrne was indicted on two counts of willfully filing false income tax returns for the taxable years 1972 and 1973 in violation of section 7206(1). On May 1, 1978, Mr. Byrne pleaded guilty to the count covering the year 1972. After entering this plea, he *414 was questioned on the record concerning his understanding of the guilty plea and during the course of the questioning said that he understood now that the funds accepted for the furniture and the automobile for his son should have been reported as income, but had not known that at the time the return was filed. With respect to the year 1973, Mr. Byrne pleaded guilty under North Carolina v. Alfred, 400 U.S. 25 (1970). On one occasion when Mr. Campagna went to Mr. Posner's home, Mr. Byrne and Mr. Turner were both there. At one point Mr. Posner left the room in which the four of them were talking and Mr. Campagna went over to the bar to fix himself a drink. As Mr. Campagna turned around, he saw Mr. Byrne hand Mr. Turner an envelope similar to the type envelope that Mr. Campagna had from time to time delivered to Mr. Byrne containing cash. On October 19, 1972, Mr. Byrne deposited into his checking account at the United California Bank, San Francisco, California, a cashier's check for $ 12,000. Mr. Ferrari spoke a number of times during 1972 with Mr. Prodanovich with respect to cash funds being raised, and in these conversations he was given to understand that *415 10 percent of the amounts received from the progress payments on Line A and Lines B and C was to go to "the boys," which he understood to be union officials. Facts Respecting the Income Tax of Mr. and Mrs. Prodanovich
In early September 1972, Mr. Prodanovich was informed by William A. Glass and another individual that a piece of property that was basically landfill property was for sale. Mr. Prodanovich was of the opinion that the development of this property would offer a fine opportunity for Prodanovich, Inc., to obtain contracts. He was also of the opinion that Prodanovich, Inc., could make a downpayment on the property and, because of the price at which the property was to be sold, sell the purchase contract to either Mr. Turner or associates of Mr. Turner and obtain contracts for Prodanovich, Inc., when the property was developed. Mr. Glass was engaged in a real estate business and he and Prodanovich, Inc., and another person agreed to enter into a contract to purchase the property for $ 862,500. A downpayment of $ 50,000 was required. The contract provided that if the escrow was not closed prior to October 21, 1972, the title company was to deliver the $ 50,000 to *416 the seller as liquidated damages. After this contract was entered into by Mr. Glass as nominee and the real estate company representing the seller, the three persons who were attempting to sell the land to other persons were unable to sell it. The $ 50,000 paid into the escrow was by a check on the bank account of Prodanovich, Inc., drawn by Mr. Crvarich in the amount of $ 50,000. When it was clear that the land could not be sold by Prodanovich, Inc., and the other two persons involved prior to October 21, 1972, a bond was put up to extend the time for the escrow. The bond was put up by a check of Prodanovich, Inc., signed by Mr. Crvarich for $ 5,000. The persons who had signed the contract to purchase the property were unable to get a purchaser for the property within the extended time. The $ 5,000 was returned to Prodanovich, Inc., when the bond was released and about $ 11,000 of the $ 50,000 that had been put in escrow was also returned to Prodanovich, Inc. On July 28, 1972, Prodanovich, Inc., drew a check for $ 10,000 to James W. Kirchanski and on September 12, 1972, drew a check to Mr. Kirchanski for $ 15,000. The purpose of these checks was to purchase an interest in *417 a corporation being formed by Mr. Kirchanski called Tutoring Techniques Institute (TTI). Mr. Kirchanski was forming TTI for the purpose of providing tutoring services for private organizations such as unions. Mr. Prodanovich always had an interest in boys' clubs and working with young people and had seen the difficulty uneducated young persons had in obtaining work. He was therefore interested in the work TTI proposed to do. Also, Prodanovich, Inc., hired many construction workers, some of whom ran expensive heavy equipment,and Mr. Prodanovich thought a tutoring service might improve the skills of construction workers and enable them to better operate the expensive machinery used by Prodanovich, Inc. Mr. Crvarich enclosed the $ 10,000 check dated July 28, 1972, in a letter also of that date addressed to Mr. Kirchanski. This letter stated: Enclosed herewith is a check in the amount of $ 10,000 as part payment for 50,000 shares of TTI, Inc., of Nevada to be purchased by Danilo Prodanovich, pursuant to oral agreement between you and Mr. Prodanovich. No written agreement was entered into between Mr. Kirchanski and Mr. Prodanovich or Prodanovich, Inc., relating to the stock investment. *418 There was no indication or representation made to Mr. Kirchanski that the $ 25,000 paid for the purchase of the stock was on behalf of Prodanovich, Inc., and it was Mr. Kirchanski's understanding that the stock was being purchased by Mr. Prodanovich. If stock had been issued, Mr. Kirchanski would have had it issued in the name of Mr. Prodanovich. The business of Prodanovich, Inc., had always been exclusively in the field of construction work. The only stock that Prodanovich, Inc., has ever owned in its corporate name is stock of subsidiaries engaged in various forms of construction work. The $ 25,000 advanced to Mr. Kirchanski was not reflected on the books of Prodanovich, Inc., as an asset. No shares of stock of TTI were ever issued. Many of the adjustments made by respondent in his notices of deficiency to petitioners have been disposed of by agreement of the parties. Only those adjustments set forth in our statement of the issues are still in controversy. ULTIMATE FINDINGS OF FACT 1. In 1972 petitioner Joseph P. Byrne received $ 84,000 in excess of the $ 105,000 he advanced to Mr. Prodanovich or Prodanovich, Inc., from Prodanovich, Inc., in the form of checks or cashier's *419 checks. 2. Mr. Byrne at no time during 1972 or 1973 made any cash loans to Mr. Prodanovich or Prodanovich, Inc. 3. Petitioner Joseph P. Byrne received $ 204,000 in cash from Prodanovich, Inc., during the year 1972. He passed on to or expended for the benefit of Mr. Turner and Mr. Posner $ 102,000 of this amount during 1972. 4. Mr. Prodanovich understood when he delivered cash from progress payments to Prodanovich, Inc., to Mr. Byrne that approximately one-half of the amount delivered was to be paid over to union officials in the hope of obtaining future contracts for BAMCO and for Prodanovich, Inc. 5. Mr. Byrne has failed to show that the amounts of $ 15,861 in 1972 and $ 4,967 in 1973 of unexplained bank deposits were not properly includable in his income. 6. Mr. Byrne received $ 47,300 in cash from Mr. Campagna in 1973, which Mr. Campagna obtained by increasing the amount of invoices presented by BAMCO to SSI for payments for services or materials other than progress payments to Prodanovich, Inc. 7. No joint venture existed between Joseph P. Byrne or Braun and Mr. Prodanovich or Prodanovich, Inc., relating to the Vallejo Project. 8. Respondent has failed to *420 establish by clear and convincing evidence that section 162(c)(2) requires the disallowance of a deduction by Prodanovich, Inc. of payments made to Mr. Byrne. 9. Mr. and Mrs. Prodanovich are not taxable on any part of the $ 55,000 which Prodanovich, Inc., paid on its own behalf in connection with the purchase of land or the entry into a land contract in 1972, but are taxable on the $ 25,000 which Prodanovich, Inc., paid to TTI or to Mr. Kirchanski for the purpose of purchasing TTI stock for the personal benefit of Mr. Prodanovich. The $ 25,000 represents a dividend from Prodanovich, Inc., to Mr. Prodanovich, taxable to the extent of available current or accumulated earnings and profits of Prodanovich, Inc., in the year 1972. OPINION The issues in this case other than the issue of collateral estoppel are purely factual. The record is voluminous, but we have concluded from all the evidence of record that Mr. Byrne received $ 84,000 in cashier's checks or checks from Prodanovich, Inc., in excess of any amounts he advanced to Mr. Prodanovich or Prodanovich, Inc., in 1972. We have also concluded that Mr. Byrne received $ 204,000 in cash from Mr. Prodanovich in 1972 and that he *421 transferred $ 102,000 of this amount to Mr. Turner and Mr. Posner, either as cash or in payment for properties he purchased jointly with them. We have also concluded that Mr. Byrne received at least $ 47,300 in cash from Mr. Campagna in 1973 from funds Mr. Campagna raised with Mr. Byrne's cooperation by either falsifying invoices submitted by BAMCO to SSI or increasing amounts shown on legitimate invoices. We have also concluded that Mr. Byrne has totally failed to explain the bank deposits of $ 15,861 in 1972 and $ 4,967 in 1973 that respondent determined constituted additional income received by him. Because of the factual nature of our determination, no lengthy discussion is necessary. The determination in this case with respect to the income received by Mr. Byrne basically depends on whether we believe the testimony of Mr. Byrne or believe the testimony of Mr. Prodanovich and Mr. Campagna, which in many respects was corroborated by other witnesses and by documentary evidence. Mr. Byrne testified that, in addition to the $ 105,000 of checks he gave to Mr. Prodanovich in 1972, he loaned him or Prodanovich, Inc., $ 84,000 in cash. Mr. Prodanovich testified that Mr. Byrne did *422 not lend him any cash in 1972. He further testified that the checks given to him by Mr. Byrne were not because he or Prodanovich, Inc., needed or sought loans from Mr. Byrne but because Mr. Byrne devised the scheme to account for checks he received from Prodanovich, Inc. There are in evidence records kept currently on accounting-type paper by both Mr. Prodanovich and the treasurer of Prodanovich, Inc., Mr. Kojovich, who kept the records at Mr. Prodanovich's instructions, supporting Mr. Prodanovich's testimony. Mr. Kojovich testified with respect to the records he kept. None of these records show any cash loans made by Mr. Byrne or Braun to either Mr. Prodanovich or Prodanovich, Inc. The checks are shown on these sheets. The evidence shows that Mr. Prodanovich was keeping his records with respect to the Vallejo Project and was having the treasurer of Prodanovich, Inc., Mr. Kojovich, keep a record so that he would know with accuracy exactly what happened to the funds he received from BAMCO in connection with the project. Mr. Byrne told a revenue agent that he had never had more than $ 16,000 of cash on hand at any one time. This is directly contrary to his testimony at the trial *423 that he had at least $ 100,000 in cash on hand in 1972 from which he made cash loans to Mr. Prodanovich. Also, the times when the checks were given to Prodanovich, Inc., were when the company had received or was due to receive progress payments and would not be in need of loans. Mr. Byrne's testimony was that some of the "cash loans" were made at about the same time as the checks were drawn to Prodanovich, Inc. We believe Mr. Prodanovich's testimony with respect to these payments to Mr. Byrne. Mr. Byrne testified that he passed the envelopes containing cash given to him by Mr. Prodanovich on to Mr. Posner and Mr. Turner without opening any of the envelopes except the first envelope Mr. Prodanovich gave him. He testified that when Mr. Prodanovich told him he had agreed to make "kickbacks" to Mr. Turner and Mr. Posner, he refused to go forward with the planned joint venture between Braun and Prodanovich, Inc. This testimony is contrary to the statements made by Mr. Byrne to respondent's agents and an attorney for the Strike Force that he never received any cash from Mr. Prodanovich. The record also shows that Mr. Byrne was a longtime friend of Mr. Turner and Mr. Posner, that *424 he arranged for the BAMCO handling of the SSI project and also arranged for Prodanovich, Inc., to be the low bidder on Line A and Lines B and C. The record shows that Mr. Byrne was the one who insisted on the estimates on the project being increased. The inference in the record is clear that Mr. Byrne was the one who had Mr. Prodanovich up his bid from the amount he originally estimated to be a fair price for the project. The inference is also clear that Mr. Byrne made the arrangements for the "kickbacks" to Mr. Turner and Mr. Posner of whatever amount of the cash he passed on to them. As hereinafter discussed, we have concluded that Mr. Prodanovich did intend that a part of the cash he gave to Mr. Byrne be passed on to Mr. Turner and Mr. Posner to help in obtaining further work from SSI. However, it is equally clear that a part of this cash was intended for Mr. Byrne. In our view, the totality of the evidence is not only clear and convincing but is overwhelming that the $ 84,000 was given to Mr. Byrne in 1972 by Prodanovich, Inc., with the intent that the money be retained by Mr. Byrne and that Mr. Prodanovich gave Mr. Byrne envelopes containing cash of $ 204,000 in 1972. *425 Our only difficulty with the factual determination in this case is to decide what portion of the $ 204,000 Mr. Byrne passed on to Mr. Turner and Mr. Posner and whether this amount was passed on with the tacit agreement of Mr. Prodanovich or with an understanding by Mr. Prodanovich on behalf of Prodanovich, Inc., that it would be passed on to Mr. Turner and Mr. Posner. There is evidence in the record other than Mr. Byrne's testimony to support the fact that some cash was handed by Mr. Byrne to Mr. Turner. Mr. Campagna testified to seeing Mr. Byrne hand to Mr. Turner a manila envelope of the type that both Mr. Prodanovich and Mr. Campagna said they used in giving cash to Mr. Byrne. Other inferences in the record support the conclusion that Mr. Byrne passed on some cash to Mr. Turner and Mr. Posner. Mr. Posner cooperated in the payment by SSI of inflated invoices submitted by BAMCO. Neither Mr. Turner nor Mr. Posner questioned the bid procedures used by BAMCO. Neither of them investigated who the other bidders were when the contract was awarded to Prodanovich, Inc. The inference from the record is that Mr. Turner and Mr. Posner, who were handling the project on behalf of SSI, *426 were aware that funds were being diverted from the project. We have carefully considered the testimony of Mr. Prodanovich that he considered all the funds he gave to Mr. Byrne initially to be advances under some form of joint venture, and only later found out that some of these funds were being passed on to union officials. However, we view his testimony as being that he considered these funds as "advances" to enable Mr. Byrne to arrange to get further work for BAMCO and Prodanovich, Inc., from SSI. Mr. Prodanovich never explained satisfactorily exactly what he considered Mr. Byrne was doing with the funds in order to get the additional work. In our view, the inference is clear that Mr. Prodanovich considered the $ 204,000 cash funds given to Mr. Byrne to include moneys to be used in part by Mr. Byrne personally and in part, as he put it, "for the boys" or "to grease the skids." The record is not clear whether the amount which was to go to Mr. Byrne was because of Mr. Byrne arranging for Braun to get the construction bond for Prodanovich, Inc., or was because all along the siphoned off funds were to go both to Mr. Byrne, for arranging the project for Prodanovich, Inc., as well *427 as for Mr. Byrne to use to influence other persons, primarily the persons running SSI, to give other work to BAMCO and Prodanovich, Inc. Respondent argues that because there is no clear-cut evidence as to how much of the cash, if any, Mr. Byrne gave to Mr. Turner and Mr. Posner, the entire amount should be taxed to him. It is respondent's position that as between Prodanovich, Inc., or Mr. Prodanovich and Mr. Byrne, the funds were Mr. Byrne's and therefore, even if Mr. Byrne did pass some of the funds on to Mr. Turner and Mr. Posner, he should be taxed on the entire amount since any funds passed on would be illegal kickbacks from Mr. Byrne to Mr. Turner and Mr. Posner. We do not, however, interpret the testimony as a whole in the manner in which respondent interprets it. In our view, considering all the evidence in the record, it appears that some part of the cash delivered by Mr. Prodanovich to Mr. Byrne was intended by Mr. Prodanovich to be for Mr. Byrne to pass on to union officials. Mr. Prodanovich may not have known that the union officials who were to receive the cash were Mr. Turner and Mr. Posner. However, as we view the evidence, he knew some of the cash was to go to *428 union officials. There is very little evidence as to the amount which Mr. Prodanovich understood would be passed on to Mr. Turner and Mr. Posner. We have, however, considered the evidence that is in the record indicating these amounts. The record shows that Mr. Prodanovich told his superintendent, Mr. Ferrari, that "the boys" were to get approximately 10 percent. Ten percent of the total payment of $ 1,257,392 would of course be $ 125,739. However, while the payments were going on, 10 percent of each project payment was being held back until the entire job was completed. Therefore, the payments to which the 10 percent would be applied would have totaled in the vicinity of $ 113,000. It is not clear that some further amounts were not being held back since it was June 22, 1973, when Prodanovich, Inc., received the final payment of $ 15,000 of the total receipts from the project. Therefore, the $ 102,000 we have found roughly approximates 10 percent of the current project payments being received by Prodanovich, Inc. If the $ 84,000 paid directly to Mr. Byrne is also eliminated from the payments, the $ 102,000 is very close to 10 percent of the progress payments being currently *429 received by Prodanovich, Inc. The record also shows that the cash amounts which were given by Mr. Prodanovich to Mr. Byrne were intended to be approximately 20 percent of the progress payments received although Mr. Prodanovich testified that he considered some of these amounts as "advances" with an accounting to be made later. Another factor which we have considered is that Mr. Prodanovich's final estimate of an amount to bid for Line A of the project was $ 681,000 and this bid apparently was intended to include a profit. This estimate was apparently made after Mr. Prodanovich knew that Braun would put up the performance bond for Prodanovich, Inc. Between the time of working out the $ 681,000 estimate and the placing of the actual bid, the bid price was upped to $ 757,387. The difference in the two amounts is approximately $ 76,000, and an inference could be drawn that this amount plus some amount similarly included in the bid on Lines B and C was the amount added to the estimate after Mr. Prodanovich realized that some portion of each payment would be kicked back to the union officials who ran SSI, as well as the fact that profits would be shared with Mr. Byrne. There is nothing *430 in the record to show that Mr. Prodanovich knew that the union officials who were to get the money were Mr. Turner and Mr. Posner. It is not clear that he was ever told exactly who the union officials were who were to receive the funds. The clear indication from the record is that the agreement with Mr. Turner and Mr. Posner was not made by Mr. Prodanovich. The inference from the record is that Mr. Byrne made these arrangements. Mr. Byrne had known Mr. Posner all his life. He had known Mr. Turner for many years. In explaining the invoicing method used when BAMCO invoices were presented to SSI, Mr. Byrne referred to the fact that his daughter worked at SSI. The record also shows that Mr. Turner, Mr. Posner, and Mr. Byrne were joint owners of a number of properties and were social as well as business friends. However, in making our determination that Mr. Byrne was merely a conduit for $ 102,000 of the funds given to him in cash by Mr. Prodanovich, we consider the important fact to be that Mr. Prodanovich did know that approximately half of the cash funds he gave to Mr. Byrne were to be passed on to other individuals and that his intent when the cash funds were given to Mr. Byrne *431 was that a portion of the amount be passed on to union officials. Amounts received as kickbacks are properly includable in a taxpayer's income. However, where a person receives funds merely to enable him to act as a conduit of those funds to another, the recipient does not have a claim of right to the funds and therefore such funds are not income to him to the extent he actually does pass them on to the person for whom the funds are intended. See Goodwin v. Commissioner, 73 T.C. 215, 232 (1979). [7] We therefore conclude that of the $ 204,000 cash given to Mr. Byrne by Mr. Prodanovich, $ 102,000 was income to him and that $ 102,000 were funds of which Mr. Byrne was merely a conduit. We believe the testimony of Mr. Campagna with respect to the portion of the receipts obtained from the false or inflated invoices which BAMCO submitted to SSI in 1973 that was given to Mr. Byrne. Mr. Campagna was merely an employee of BAMCO. Mr. Byrne *432 was the manager of BAMCO affairs on a day-to-day basis after Mr. McIlroy left the company and by June 1973 was the sole stockholder of BAMCO. The record indicates that Mr. Byrne was the final authority with respect to activities carried on by BAMCO, even while Mr. McIlroy was managing the day-to-day affairs. However, respondent has not included in Mr. Byrne's income any part of the funds derived from the inflated and false invoices which Mr. Campagna paid over to Mr. McIlroy while Mr. McIlroy was supervising the day-to-day activities of Mr. Campagna in connection with his work for BAMCO. Therefore, we have no issue as to whether any of these funds went to Mr. Byrne. However, we consider the evidence clear that a part of the funds siphoned off from the Vallejo Project by the false and inflated invoices went to Mr. Byrne after June 1973 when Mr. McIlroy was no longer managing the day-to-day affairs of BAMCO. In deciding whom we believe with respect to the disposition of the funds raised by the false and inflated invoices, we have not overlooked the fact that both Mr. Campagna and Mr. Craig were granted immunity from criminal prosecution in connection with their testimony before *433 the Grand Jury that indicted Mr. Byrne for filing false returns for 1972 and 1973, and that their testimony at the trial of this case was apparently the same as that given before the Grand Jury. Specifically, we believe the testimony of Mr. Campagna that Mr. Byrne approved the false and inflated invoices which were included with invoices from BAMCO to SSI knowing these invoices to be false. The record shows that some of these invoices were actually made up in BAMCO's offices and that after BAMCO's offices were moved to the Braun offices, Mr. Campagna's office was right next door to Mr. Byrne's. Mr. Campagna was an employee and not a principal of BAMCO and the record shows that he consulted with Mr. Byrne on all matters of importance in the operations of BAMCO. The evidence is clear and convincing that some part of the funds derived through the false and inflated invoices were transferred by Mr. Campagna to Mr. Byrne. Respondent initially set up an amount in excess of $ 68,000 as being the portion of the amounts derived from false and inflated invoices submitted to SSI which was passed on to Mr. Byrne. Although the record is clear that some part of this amount was given to Mr. *434 Byrne, it is not equally clear as to how much. However, once we have concluded that Mr. Byrne received some of these funds, the burden is on him to show the amount. On brief, respondent conceded that the amount was not in excess of $ 47,300 and requested a finding that this was the amount received in 1973 by Mr. Byrne from the funds that were received through the false and inflated invoices. In our view, the record amply supports the reduced amount of $ 47,300 as the amount received by Mr. Byrne. The only evidence dealing with the unexplained bank deposits concerns the $ 12,000 of these deposits in 1972 which was from a cashier's check obtained at the Wells Fargo Bank. Mr. Byrne first testified that the $ 12,000 cashier's check was received as a refund of a deposit on a piece of property he had considered buying from Bankers and Bankers. However, the record shows that Bankers and Bankers account was with the United California Bank. When this was called to Mr. Byrne's attention, he stated that the amount may have been a repayment to him from Mr. Posner in connection with the purchase of the Silverado property. The record shows that this property was purchased sometime in 1971, *435 over a year prior to the date of the deposit of the $ 12,000 cashier's check. In fact, the record contains no satisfactory evidence as to the source of the funds respondent determined as income to petitioner from unexplained bank deposits. We sustain respondent's determination because of petitioner's failure to meet his burden of proof. See Hague Estate v. Commissioner, 132 F.2d 775 (2d Cir. 1943), affg. a Memorandum Opinion of this Court; Jones v. Commissioner, 29 T.C. 601, 618-620 (1957). The record is clear and convincing that Mr. Byrne had unreported income in both 1972 and 1973 which could not have been omitted by any mistake. The omission of large amounts of income under circumstances such as are present in this case is indicative of fraud. See Lyndon v. Commissioner, 351 F.2d 539, 545-546 (7th Cir. 1965), affg. a Memorandum Opinion of this Court; Hill v. Commissioner, 59 T.C. 846, 856 (1973). However, the record is replete with other evidence of fraud on the part of Mr. Byrne. The record shows that when Mr. *436 Byrne was approached by the revenue agents, he told them he never had more than $ 16,000 in cash although in this case he testified that he had over $ 100,000 in cash by 1969 and even attempted to support this conclusion by putting on witnesses with respect to certain activities in which he had been engaged in the 1940's whereby he might have acquired cash. He also told the special agent and revenue agent that he never received any cash from Mr. Prodanovich but testified at the trial of this case that he had received envelopes containing cash which he had passed on to Mr. Turner and Mr. Posner. The record also shows that when the investigation of his tax returns began, he talked to Mr. Prodanovich about arranging some joint story to tell the Internal Revenue Service. Deliberate misrepresentations to respondent's agents during the course of an investigation are indicative of fraud. McGee v. Commissioner, 519 F.2d 1121, 1126 (5th Cir. 1975), and cases there cited. The record even shows that at one junction Mr. Byrne considered having the records kept by Mr. Prodanovich *437 with respect to the Vallejo Project burned. In our view, the evidence of fraud in this case is clear and convincing. We conclude from this evidence that Mr. Byrne filed false and fraudulent returns for each of the years 1972 and 1973 with intent to evade tax. It follows that the assessment and collection of tax for each of these years is not barred by the statute of limitations and that a part of the underpayment of tax for each of these years is due to fraud, causing Mr. Byrne to be liable for the addition to tax under the provisions of section 6653(b). Since we have found on the basis of the record that Mr. Byrne filed false and fraudulent income tax returns for each of the years 1972 and 1973 with intent to evade tax, it is unnecessary for us to consider the collateral estoppel issue raised by respondent in this case. The findings we have made with respect to the $ 55,000 paid by Prodanovich, Inc., in 1972 in connection with the purchase of a piece of property and the $ 25,000 amount paid by the corporation in connection with a stock purchase, both of which amounts were determined by respondent to be dividend income to Mr. Prodanovich, disposes of that issue. In our view, *438 the record is clear that the $ 55,000 put up by Prodanovich, Inc., in connection with the land purchase contract was put up on its own behalf and for a business purpose of the corporation. The intent was that the corporation enter into the contract with two other persons to buy the land and sell or assign the contract to purchase the land to individuals who would develop the land. It was intended that Prodanovich, Inc., obtain additional construction business from the development of the land. We therefore conclude that the $ 55,000 was paid by the corporation on its own behalf and was not dividend income to Mr. Prodanovich. The situation is different with respect to the $ 25,000 put up by Prodanovich, Inc., in connection with the intended purchase of stock of TTI. The letter accompanying the first payment for the stock stated that the stock was being purchased by Mr. Prodanovich. The person organizing the corporation understood that Mr. Prodanovich was purchasing the stock for himself. The operation that was to be carried on by the corporation was one in which Mr. Prodanovich had a personal interest. Any business connection that Prodanovich, Inc., might have had with a corporation, *439 such as TTI was intended to be, would be remote. In our view the evidence is clear that the investment in TTI stock was to be made by Mr. Prodanovich. The $ 25,000 was not shown as an investment on the books of Prodanovich, Inc. We therefore sustain respondent in his determination that Mr. Prodanovich received a dividend of $ 25,000 from Prodanovich, Inc., when Prodanovich, Inc., put up that amount for a purchase of TTI stock for Mr. Prodanovich. The figures with respect to the income of Prodanovich, Inc., for 1972 are stipulated except that the corporate petitioner contends that it had some form of joint venture with either Mr. Byrne or Braun and that the funds transferred by Mr. Prodanovich to Mr. Byrne should, to the extent of a one-half interest in the income from the Vallejo Project, be considered to be Braun's profit interest. There is no showing in this record of any sums paid to Braun, the claimed joint venturer. The cashier's checks that formed a part of the $ 84,000 from the progress payments of Prodanovich, Inc., on the Vallejo Project given to Mr. Byrne were endorsed by Mr. Byrne and deposited in Mr. Byrne's personal account. The checks drawn on Prodanovich, Inc. *440 's account in payment of part of the $ 84,000 were drawn to the order of Mr. Byrne, not of Braun. The testimony is that the cash which was either taken by Mr. Prodanovich to Mr. Byrne's office or picked up by Mr. Byrne in Mr. Prodanovich's office was in an envelope which was taken by Mr. Byrne. Any reasonable interpretation of the document entitled "Joint Venture Agreememt" which we have quoted in our findings is that Braun and Prodanovich, Inc., would enter into a joint venture agreement for performance of contracts in connection with the Vallejo, California, Project of SSI. No further agreements were entered into but in fact Prodanovich, Inc., proceeded with the project on its own account. Neither the board of directors of Braun nor Prodanovich, Inc., ever considered the joint venture agreement or voted to enter into such an agreement. No books were set up for a joint venture and no license for a joint venture was obtained. Clearly, neither party treated the March 14, 1972, agreement as a joint venture agreement. The record shows that Mr. Byrne was not a stockholder of Braun and therefore no assumption could be made that the directors of Braun would have authorized any joint *441 venture between that corporation and Prodanovich, Inc. Mr. Byrne's explanation of why no joint venture was entered into was that shortly after the March 14, 1972, agreement was signed, Mr. Prodanovich told him that 10 percent of the receipts from the work done on Line A was to go to Mr. Turner and Mr. Posner. Mr. Byrne testified that when Mr. Prodanovich gave him this information, he said he wanted nothing to do with the joint venture and that Braun would not go forward with entering into a joint venture agreement. Mr. Prodanovich denied any such conversation took place and we believe Mr. Prodanovich in this regard. However, there is no showing in this record that there was ever any intent for Braun and Prodanovich, Inc., to go forward with any joint venture. The record is lacking in information as to why the March 14, 1972, document was signed since Mr. Byrne had demanded that part of the funds from the progress payments on Line A as well as on Lines B and C be given to him, not to Braun. The facts show that neither Mr. Byrne nor Mr. Prodanovich intended any part of the funds given to Mr. Byrne for Braun. Mr. Byrne was not a stockholder in Braun. If any payments had been made *442 to Braun, some argument might exist that some de facto joint venture existed. However, the payments were made to Mr. Byrne. The facts in this record fail to show that any joint venture existed between Braun and Prodanovich, Inc., or between Mr. Byrne and Prodanovich, Inc., or Mr. Byrne and Mr. Prodanovich. [8] We therefore conclude that all receipts from the Vallejo Project were properly reportable as gross income by Prodanovich, Inc. *443 Having concluded that the receipts from the Vallego Project were all gross income of Prodanovich, Inc., it is necessary to decide whether Prodanovich, Inc., is entitled to any deduction for the moneys given by Mr. Prodanovich to Mr. Byrne. From the very nature of the payments made by Mr. Prodanovich to Mr. Byrne, we have grave doubts that they constituted ordinary and necessary business expenses of Prodanovich, Inc., under section 162(a). However, as we have heretofore pointed out in footnote 6, counsel for respondent stated that the only issue with respect to these payments was whether the deduction was to be disallowed under section 162(c)(2), and counsel for petitioner agreed that the disallowance of deductions under section 162(c)(2) was the only issue in this respect. Although there is a dearth of evidence in this record to show that these payments were ordinary and necessary expenses of Prodanovich, Inc., deductible under section 162(a), it may be that Prodanovich, Inc.'s counsel considered that this fact had been conceded by the agreement of the parties that the issue was their deduction under section 162(c)(2). In fairness to Prodanovich, Inc., we will consider only *444 whether the deduction for the payments should be disallowed under section 162(c)(2). Counsel for respondent stated that he recognized that the burden of showing that deduction for the payments should be disallowed under section 162(c)(2) was on respondent. It is clear that the statute does so provide and that respondent must make the showing of the applicability of section 162(c)(2) by clear and convincing evidence. Section 162(c)(2)[9] provides that no deduction shall be allowed as a business expense for any payment made directly or indirectly to any person if the payment constitutes an illegal bribe, illegal kickback, or other illegal payment under any law of the United States or under any law of a State which is generally enforced, which subjects the payor to a criminal penalty or loss of license or privilege to engage in a trade or business. This section states that a kickback includes a payment in consideration of the referral of a customer. It places the burden of proof with respect to whether a payment constitutes an illegal bribe, an illegal kickback, or other illegal payment *445 upon the respondent. Although Mr. Prodanovich referred to some of the payments he made to Mr. Byrne as *446 being "advances," we conclude from the record that he knew these payments were not advances to a joint venture. In fact, he testified that the payments were being made to enable Mr. Byrne to obtain additional business for BAMCO and Prodanovich, Inc. He was not specific as to how Mr. Byrne was to obtain this additional business but did refer to the fact that he thought some of the cash was being used "for the boys" or "to grease the skids." If, in fact, Mr. Prodanovich had considered any of these payments as advances to a "joint venture," the payments would have been made to Braun and not to Mr. Byrne. Also, the payments would have been made by check and entered on the regular books of account of Prodanovich, Inc., rather than being entered on accounting-type sheet records that were not a part of the regular records of Prodanovich, Inc. We consider the record to be clear that the payments by Mr. Prodanovich to Mr. Byrne were "kickbacks." A further indication of this fact is the action of Mr. Prodanovich in having his attorney open a trust account to assist in obtaining the needed cash, but not telling the attorney the real use being made of the cash. The record also shows that Mr. *447 Prodanovich told his office manager, Mr. Kojovich, that he was obligated to make payments to Mr. Byrne because Mr. Byrne had assisted him in obtaining the Vallejo Project job. Mr. Prodanovich testified that he hoped, by making these payments, to receive future work on large contracts connected with the Hunter Ranch property. Although respondent has shown by clear evidence that the payments to Mr. Byrne were "kickbacks," the evidence is not equally clear that they were "illegal kickbacks" under any law of the United States or the State of California. The only law to which respondent refers in arguing that these "kickbacks" to Mr. Byrne are "illegal kickbacks" within the meaning of section 162(c)(2) is section 7108 and section 7116 of the Business and Professional Code of California. [10] In our view, these two sections of the California Code are not directed to the situation here present with the exception of possibly the first progress payment of $ 86,850 which was paid on an invoice of $ 96,500, an amount in excess of the work completed prior to the March 31, 1972, date of the invoice. The only amount given to Mr. Byrne which the record shows to have come from the March 31, 1972, progress *448 payments was the $ 10,000 paid to Mr. Byrne by cashier's check on April 7, 1972. The balance of the progress payments were for work which had been done. Section 7108 deals with diversion of amounts paid for work to be done or completion of a project. It is applicable only where money is diverted without payment for materials, labor, or to subcontractors. See In re Pedrazzini, 644 F.2d 756, 758-759 (9th Cir. 1981); Hutchinson v. Contractors' State License Board of California, 143 Cal. App.2d 628, 300 P.2d 216, 219-220 (Ct.App. 1956); Hollywood Wholesale Electric Co. v. John Baskin, Inc., 121 Cal. App. 2d 415, 263 P.2d 665, 675 (Ct.App. 1954). Insofar as the record here shows, the work had been done and all materials, labor, and subcontractors paid to date as each progress payment was made. The record contains no evidence of any failure by Prodanovich, Inc., to pay all costs of the project as they became due. He kept a record of all costs of the project and all such costs were paid. In our view, the record here totally fails to show *449 that the funds diverted to "kickbacks" were from funds needed to pay for the work on the project rather than amounts which otherwise would have been profit to Prodanovich, Inc. Section 7116 of the California Business and Professional Code deals with a fraudulent act whereby another is substantially *450 injured. The record here shows no injury to SSI because of the "kickback" payments except insofar as the bid price of the project may have been increased for this purpose. In fact, the record shows that the work on the pipelines was well done and that the pipelines are excellent construction. The record also shows that Prodanovich, Inc., was paid only the agreed contract price and that Prodanovich, Inc., paid all its costs of materials, labor, and subcontractors in a timely manner. It may be that SSI was harmed because of the excessively high bid put in for the Line A and Lines B and C projects. However, respondent has not shown that placing the high bid was fraudulent on the part of Prodanovich, Inc., or even argued that it was fraud on the part of Prodanovich, Inc. Prodanovich, Inc., had no control over who received the contract. Certainly Mr. Prodanovich participated in entering " complimentary" bids. However, respondent has shown no fraud on the part of Prodanovich, Inc., in respect to its bid price for the work. Section 7116 of the California Business and Professional Code appears to be geared primarily to the performance of faulty workmanship or a comparable situation *451 causing substantial injury of another. See Hutchinson v. Contractors' State License Board, supra at 220-221. Except to the extent that SSI was harmed by the excessive bids for the work, the only person shown to be harmed by the payment of "kickbacks" to Mr. Byrne was Prodanovich, Inc. The record shows that the payments from which the funds were diverted were, except in the instance of the first payment to Mr. Byrne, from funds received by Prodanovich, Inc., for work it had completed. We therefore conclude that respondent has not shown that Prodanovich, Inc., would have been subject to a loss of its license under section 7108 or section 7116 because of diverting to Mr. Byrne part of payments it received for completed work, all costs of which it had paid. Respondent has directed our attention to no other provisions of the Federal or California law which make the payments that Mr. Prodanovich made to Mr. Byrne illegal. There may well be some other such California statute or a Federal statute. However, the burden is on respondent to show the existence of all the factors required *452 for disallowance of a deduction under section 162(c)(2), including particularly whether, if any such statute existed, it was generally enforced. He has not made this showing in this case. Because we have concluded that respondent has failed to show that the kickbacks by Mr. Prodanovich to Mr. Byrne were "illegal kickbacks" under the only sections of the California Code to which he has made reference, we need not decide whether respondent has shown that section 7108 and section 7116 of the California Business and Professional Code are generally enforced. See Boucher v. Commissioner, 77 T.C. 214, 218 (1981). [11]
On the basis of this record, we conclude that respondent has failed to carry the burden imposed on him by section 162(c)(2) of showing that the "kickbacks" to Mr. Byrne were nondeductible under section 162(c)(2). [12]
*453 Prodanovich, Inc., has failed to show that some part of its underpayment of tax, if any, was not due to negligence or intentional disregard of rules and regulations. Decision will be entered under Rule 155. Footnotes
1. Cases of the following petitioners are consolidated herewith: Danilo Prodanovich, Barbara Prodanovich, docket No. 14086-79; and Prodanovich, Inc. (A dissolved Corporation), docket No. 14087-79.↩
1a. An attorney specially recognized to appear for these cases only.↩
2. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue. ↩
3. The tax liability with respect to Theresa A. Byrne has been disposed of by agreement of the parties and is no longer involved in this proceeding. ↩
4. On brief, respondent conceded that the Prodanoviches were not liable for the addition to tax for negligence for 1972. ↩
5. The parties at the trial agreed that unless respondent established that a part of the underpayment of tax by Joseph P. Byrne in each of the years 1972 and 1973 was due to fraud or that there was an omission from Mr. Byrne's gross income of an amount in excess of 25 percent of the gross income reported on his return for each such year, the assessment and collection of any deficiency is barred by the statute of limitations. ↩
6. In the notice of deficiency, respondent increased the income as reported by Prodanovich, Inc., by $ 214,547 as additional gross receipts from construction projects and disallowed a claimed expense deduction of $ 5,600 which was referred to in the explanation of adjustments as "kickback payments." It is not clear to what extent the $ 5,600 was placed in issue in the petition. In the petition, it was alleged that on respondent's basis of computing corporate income for 1972, the result was a loss of $ 119,494 because of a deduction of $ 40,000 based on a joint venture theory and a deduction of $ 294,041 described as "Funds absconded by Byrnes." The petition also alleged the existence of a joint venture with Braun and on that basis alleged that one-half of the amount of the profit was income of Braun or Mr. Byrne. However, respondent's counsel in his opening statement at the trial said: Respondent has taxed Prodanovich Inc. on the gross proceeds from the job; however, Respondent has not allowed Prodanovich Inc. a deduction for the payments made through Dan Prodanovich to Joseph Byrne because they were illegal payments not deductible under section 162(c)(2) of the Internal Revenue Code of 1954. Respondent has the burden of proof in this case to show that the payments were, in fact, illegal. Also, in stating the issues at the beginning of the taking of the evidence relating primarily to the cases of the Prodanoviches and Prodanovich, Inc., respondent's counsel stated that -- The joint venture issue, which is adjustment B in the statutory notice of deficiency, is unagreed. That also includes the issue of whether payments to Mr. Byrne are not deductible under 162-C-2. * * * Negligence penalty is unagreed, and that accounts for all of the issues in the * * * Prodanovich, Inc. case. The Court then asked the attorney for Prodanovich, Inc. "And you agree to that, Mr. Meyer?" and Mr. Meyer responded "Yes." The Court assumes that respondent does not question that the amounts paid to Mr. Byrne were ordinary and necessary business expenses properly deductible unless the deduction is prohibited by sec. 162(c)(2). Since the parties agreed that there is an issue in this case under sec. 162(c) and that it is the only issue remaining other than the joint venture and addition to tax issues, we will consider, as represented to us by respondent's counsel and agreed to by petitioner's counsel, only the question of whether respondent has shown the amounts of these payments to be nondeductible because of the provisions of sec. 162(c)(2)↩ insofar as the deduction issue is involved.
7. See also Roloff v. Commissioner, T.C. Memo. 1981-18; Nunez v. Commissioner, T.C. Memo. 1969-216↩.
8. Sec. 7029 of the Business and Professional Code of California provides as follows: Sec. 7029. License for joint venture. It is unlawful for any two or more licensees, each of whom has been issued a license to engage separately in the business or to act separately in the capacity of a contractor within this State, to jointly submit a bid or otherwise act in the capacity of a contractor within this State without first having secured an additional license for acting in the capacity of such a joint venture or combination in accordance with the provisions of this chapter as provided for an individual, copartnership or corporation. No license was obtained for any joint venture between Braun and Prodanovich, Inc., or Mr. Byrne and Prodanovich, Inc. While this fact would not be conclusive that no joint venture existed, it is indicative of that fact. All the other facts of record likewise indicate that no joint venture existed between Prodanovich, Inc., and Braun or Mr. Byrne.↩
9. Sec. 162(c)(2) provides as follows: (c) Illegal Bribes, Kickbacks, and Other Payments. -- * * * (2) Other illegal payments. -- No deduction shall be allowed under subsection (a) for any payment (other than a payment described in paragraph (1)) made, directly or indirectly, to any person, if the payment constitutes an illegal bribe, illegal kickback, or other illegal payment under any law of the United States, or under any law of a State (but only if such State law is generally enforced), which subjects the payor to a criminal penalty or the loss of license or privilege to engage in a trade or business. For purposes of this paragraph, a kickback includes a payment in consideration of the referral of a client, patient, or customer. The burden of proof in respect of the issue, for purposes of this paragraph, as to whether a payment constitutes an illegal bribe, illegal kickback, or other illegal payment shall be upon the Secretary to the same extent as he bears the burden of proof under section 7454 (concerning the burden of proof when the issue relates to fraud).↩
10. Secs. 7108 and 7116, California Business and Professional Code, provide as follows: Sec. 7108. Diversion of funds or property. Diversion of funds or property received for prosecution or completion of a specific construction project or operation, or for a specified purpose in the prosecution or completion of any construction project or operation, or failure substantially to account for the application or use of such funds or property on the construction project or operation for which such funds or property were received constitutes a cause for disciplinary action. * * * Sec. 7116↩. Wilful or fraudulent injury. The doing of any wilful or fraudulent act by the licensee as a contractor in consequence of which another is substantially injured constitutes a cause for disciplinary action.
11. See also Custis v. Commissioner, T.C. Memo. 1982-296↩.
12. We have considered the findings of fact and the judgment in the civil action filed by Prodanovich, Inc., against Braun and Joseph Byrne in the California Superior Court of Alameda County. However, there is nothing in connection with that action which we consider to bear on our conclusion in this case. We have noted that the Superior Court in its findings of fact and conclusions of law did make as its first conclusion that "Pursuant to Corporation Code 15031(1)(a) and (c); (3); (7), a dissolution of the joint venture between plaintiff Prodanovich, Inc., and defendant E. C. Braun Co., Inc., occurred prior to June 8, 1973," and that the further conclusions were (1) that plaintiff's cause of action asking for an accounting with respect to the joint venture was barred by the statute of limitations when the action was commenced on April 11, 1978, (2) that its second cause of action for breach of fiduciary duty was barred by the statute of limitations at that time, and (3) its third cause of action alleging conversion was barred by the statute of limitations when the action was filed. There is no specific finding made that the document executed on March 14, 1972, created a joint venture between Prodanovich, Inc., and Braun, but there is a finding that no joint venture license was procured by Prodanovich, Inc., and Braun for the construction work for SSI and BAMCO in Vallejo, California. The finding is made that prior to June 9, 1973, Mr. Byrne advised Mr. Prodanovich that neither he nor Braun would participate as a joint venturer with Prodanovich, Inc., in the SSI project. For this reason, we conclude that there has been no finding in the State court action that any joint venture did actually exist and that the conclusion of law is merely that whatever arrangement did exist pursuant to the March 14, 1972, agreement between Braun and Prodanovich, Inc., was dissolved prior to June 8, 1973. Because we do not consider the findings of fact and conclusions of law of the Superior Court of the State of California, County of Alameda, in the case of Prodanovich, Inc. v. E. C. Braun Co., Inc., et al., to be in any way binding or, in fact, to even make any helpful conclusion in connection with the problems we have here, we did not make any findings with regard to this action. From the voluminous evidence introduced in this case, we have concluded that no joint venture existed between Prodanovich, Inc., and Braun and that the moneys given by Mr. Prodanovich to Mr. Byrne were not advances of joint venture funds but were kickbacks by Prodanovich, Inc., to Mr. Byrne and union officials.↩