William D. **LYDON** and Myrtle I. Lydon, Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

No. 14825.

United States Court of Appeals
Seventh Circuit.

Oct. 6, 1965.

Edward J. Calihan, Jr., Allan J. Smietanka, Joseph G. Smietanka, Chicago, Ill., for petitioners.

Louis F. Oberdorfer, Asst. Atty. Gen., Tax Div., Carolyn R. Just, Lee A. Jackson, I. Henry Kutz, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before DUFFY and KNOCH, Circuit Judges, and MAJOR, Senior Circuit Judge.

DUFFY, Circuit Judge.

The Commissioner of Internal Revenue determined deficiencies in income tax and additions to tax against the petitioners [1] for the years 1953, 1954 and 1955. The amount assessed was $85,703.83 plus a 50% penalty.

In a decision dated April 15, 1964, the Tax Court held there were deficiencies in income tax for the calendar year 1953 in the amount of $23,574.20, for 1954 in the amount of $6,172.92 and for 1955 in the amount of $4,797.16; for additions to the tax for 1953 under § 293(b), IRC, in the amount of $11,787.10; for the years 1953–1954 in the amount of $2,-114.59 and $595.68, respectively, under § 294(d) (1) (A), IRC, 1939, and for the years 1954–1955 under § 6653(b), IRC, 1954, in the amount of $3,086.46 and $2,398.58, respectively.

Taxpayer claims the Tax Court's decision is not supported by substantial evidence and is erroneous. We therefore set forth in some detail statements of fact which are based upon findings of fact made by the Tax Court and which are amply supported by credible evidence in this record.

Petitioner became a patrolman on the Chicago Police Force in 1938. He had night duty. During the day, he worked for Mitchell-David, an interior decorating service. Largely through the efforts of petitioner, the business of Mitchell-David greatly increased. By 1953 petitioner had become president of Mitchell-David, and was a member of the Board of Directors.

During 1953, and until petitioner left the company in 1954, the stockholders and officers of Mitchell-David and the shares held by each were as follows:

| Name | Position | Number of shares |
|------|----------|------------------|
| William Lydon | President and Director | 2058 23/26 |
| Theodore E. Dahlfors | Vice President, Director | 2058 23/26 |
| David D. Dahlfors | Director | 926 11/13 |
| Anne H. Karpus | Secretary-Treasurer, Director | 196 7/13 |
| Total shares outstanding | | 5241 2/13 |

Petitioner met Orville Hodge in 1951 when the latter was a member of the state legislature. Hodge knew of Mitchell-David's good reputation in the decorating business and retained it to work on his Granite City, Illinois home. In 1953, Hodge contracted with Lydon to renovate the offices of his real estate and insurance firm.

Hodge was elected to the office of Auditor of Public Accounts of Illinois in November 1952. Following the election, Hodge hired Lydon to remodel his suite at the Abe Lincoln Hotel in Springfield. After Hodge took office, Lydon also commenced work on a suite of rooms rented by Hodge in the Drake Hotel in Chicago.

---

[1]. Petitioner Myrtle I. Lydon is the wife of William D. Lydon. She signed the joint income tax returns for the years 1953, 1954 and 1955. Hereafter, references to taxpayer or petitioner will refer to William D. Lydon.

The Auditor's office performed many supervisory tasks including the examination and audit of many state agencies. The auditor had a large branch office in Chicago at 188 West Randolph Street. Hodge informed Lydon of his intention to have these offices remodeled and refurnished and asked Lydon to make a survey and prepare plans. No bids were taken for this work nor was there a written contract. The oral agreement between Hodge and Lydon was that Mitchell-David was to be paid cost plus 10%.

One of the chief functions of the State Auditor's office was to prepare and issue warrants for merchandise purchased for and services rendered to the State of Illinois. About 35,000 such warrants were issued each month. Hodge discovered the warrants were prepared by hand, and the entire bookkeeping and accounting system was antiquated. Hodge decided to install modern machinery.

The normal procedure involved in the issuance of the state warrants consumed several days after an invoice had been received. However, there was a practice whereby an advance payment could be made in the form of what was known as a "rush warrant." Such a warrant could be issued within an hour's time. Most of the payments for the work done on the 188 West Randolph Street job were received in advance by means of "rush warrants" which were issued by the state at petitioner's request and without the submission of an invoice.

On May 25, 1953, the State of Illinois issued three warrants to Mitchell-David in the amounts of $4,000, $2,000 and $4,000. These warrants were endorsed and cashed on May 26 by petitioner at Southmoor Bank and Trust Company (Southmoor) and were not taken into income by Mitchell-David.

Ed. A. Hintz was a vice president of Southmore. The first time Hintz transacted any business with Lydon was when Lydon went to Southmoor on May 26, 1953, with the three warrants hereinbefore described, and requested Hintz to cash them. Hintz asked petitioner to furnish written authority from the corporation. On May 27, petitioner furnished Hintz with a printed form authorizing payments out of its funds upon checks issued by the corporation and signed by the president, Lydon.

Hodge opened a checking account at Southmoor in December 1953. Hintz personally maintained this account at Southmore, but not according to customary banking procedures. This account was kept on regular bank ledger sheets, but instead of entries being made by machine, Hintz personally entered them by hand. Some checks on this account would come to Southmoor through the clearing house; at other times, Hodge would telephone Hintz and advise him that a messenger would deposit or would pick up some money. Hodge's memorandum checking account became known as the "Brown Envelope Account" because Hintz kept the ledger sheets in a brown envelope.

On July 10, 1953, the state issued two additional warrants to Mitchell-David in the amounts of $10,000 and $35,585. The latter was deposited in the Mitchell-David account but the $10,000 warrant was endorsed and cashed by petitioner and was not taken into income by Mitchell-David.

A similar transaction occurred on August 13, 1953 when the state issued two warrants in the amounts of $15,000 and $5,000. The $15,000 warrant was deposited to Mitchell-David's account, but the $5,000 warrant was endorsed and cashed on August 14 by petitioner at Southmore and was not taken into income.

Another similar transaction involved three warrants of $10,000, $5,000 and $15,232.48, respectively, issued to Mitchell-David on October 28, 1953. The disposition of the $5,000 warrant is here in issue.

The last two state warrants payable to Mitchell-David were issued on December 22, 1953, in the amounts of $2,606.01 and $2,411.28. Petitioner cashed these warrants at Southmoor and they were

not reported into income by Mitchell-David.

Thus, in 1953, Lydon cashed eight warrants payable to Mitchell-David for the aggregate sum of $35,017.29 none of which were reported as income by Mitchell-David.

On March 24, 1954, the state issued a $504.34 warrant to Mitchell-David which petitioner endorsed and cashed. The proceeds of this warrant are in issue.

In 1953, the S. L. Crost Construction Company (Crost Company), a subcontractor for Mitchell-David, did remodeling work on the ±88 West Randolph Street job at Lydon's request Harold H. Crost was an architect and contractor associated with Crost Company. Lydon went to Crost's office to instruct Crost how he wanted the invoices made out. Petitioner wrote on a sheet of note paper the sum he wanted Crost to charge Mitchell-David. One set of figures indicated $32,869.31. Another set of figures totaled $37,662.23. Both sets of figures were higher than Crost Company's original bids to Mitchell-David.

On July 13, 1953, petitioner gave Crost Company a Mitchell-David check for $1600 and asked Crost to turn the proceeds back to him which Crost did.

On July 27, 1953, Mitchell-David issued a check of $2,000 to Crost. The following day this check was cashed by Crost and the proceeds turned over to petitioner at petitioner's request.

On October 29, 1953, petitioner gave Crost two Mitchell-David checks. On November 2, 1953, Crost cashed the check for $2077.33 and turned over the proceeds to petitioner at the latter's request.

On December 1, 1953, Mitchell-David issued a check to Crost in the amount of $1,000. This was cashed by Crost and the proceeds turned over to petitioner at his request.

Crost cashed the various checks as an accommodation to petitioner. Crost did not consider the proceeds of these checks as being for work done.

Petitioner's relationship with Crost was of a different nature than with Hodge. Crost Company was a subcontractor for Lydon's company and Crost was dependent on Lydon for a good share of his company's business. Petitioner used his dominant position to ask Crost to raise invoices and kick back part of the proceeds which had been received from Mitchell-David.

The pattern of these transactions is clearly shown by Crost's raised bids of May 24, 1953. Lydon prepared the two sets of bids in his own handwriting. Crost charged Lydon the lower amount while Lydon used the higher amount in billing the state.

Lydon thus benefited from both ends of the transactions with Crost. He pocketed the "kick-back money" and at the same time he used the raised invoices as the basis of his 10% profit from the state.

On April 29, 1954, Mitchell-David issued a check to "currency" in the amount of $236.40. This check was endorsed and cashed by petitioner at Southmoor on May 5, 1954, and was not taken into his income for that year.

Petitioner was one of the organizers of "Interiors for Living" (Interiors) which represented various manufacturers and distributors, and had a display space in the Merchandise Mart building in Chicago.

In 1953, Crost Company did remodeling and alteration work for Interiors at the request of petitioner. Its 1953 work for Interiors started in March and ended in May. On July 18, 1953, Crost Company issued an invoice for the 1953 work for Interiors in the amount of $4,537. It was recited that $3,000 had been paid on account.

Interiors' cash disbursement journal reflected payments of $1,000 each on March 24, May 1, May 12 and July 28, 1953. The two May 1953 checks were given to Crost by petitioner and were cashed at the Lakeshore National Bank on May 15, 1953 at petitioner's request. Crost turned back to petitioner the proceeds of all checks that he had cashed at petitioner's request.

In late January or early February, 1954, Dahlfors told petitioner that he felt it was in the best interests of Mitchell-David that petitioner resign as president and director. Petitioner did resign effective April 30, 1954, and his resignation was unanimously accepted.

In connection with petitioner's resignation, Mitchell-David agreed to redeem the 2058 23/26 shares of its stock held by petitioner. The negotiated sale price was $25,000 cash, an Oldsmobile valued at $2100 and various accounts receivable. In 1954, petitioner received approximately $9,000 from the accounts receivable.

After petitioner left Mitchell-David, the company suffered financial difficulties, became insolvent and executed an assignment for the benefit of its creditors.

After his resignation, petitioner engaged in a business similar to that of Mitchell-David. He was a sole proprietor under the name Fabric-Crafts Sales Company (Fabric-Crafts). On March 15, 1954, petitioner opened a checking account at Southmoor in the name of Fabric-Crafts.

In 1954, the State of Illinois issued the following warrants to Fabric-Crafts: March 30, $8,000; June 29, $2,500 and July 15, $4,169. The warrant for $2,500 was endorsed and cashed by petitioner but was not recorded in the books of Fabric-Crafts, nor taken into petitioner's 1954 income.

On July 18, 1954, Fabric-Crafts issued a check for $3,950 payable to Crost Company. The check was endorsed and cashed by Crost who turned back $2,150 to petitioner at the latter's request.

On January 17, 1955, Fabric-Crafts issued an invoice to the state for $441.92 for the repair of a sofa in Hodge's private office at 188 West Randolph Street. The state issued a warrant. Lydon endorsed and cashed the warrant but did not report the proceeds as income.

On November 21, November 28 and December 16, 1955, the state issued warrants in the amounts of $36,000, $26,239.-84 and $30,000. They were endorsed by

or at the direction of Hintz for deposit in Fabric-Crafts' account $21,000 and $7,500 respectively being taken from the first two deposits and put into the brown envelope account at Southmoor. Hintz also took $5,000 from the $30,000 deposit and paid it over to Lydon who did not take this amount into income. Only the last item of $5,000 is in issue here.

On October 10, 1955, Fabric-Crafts issued a check payable to Crost for $1,-979.82 which Crost cashed. He handed petitioner the sum of $700. There were other somewhat similar transactions with Fabric-Crafts which we shall not detail.

The Orville Hodge "scandal" broke in 1956. Newspapers carried stories of the irregularities in transactions emanating from the State Auditor's office. Hodge was called upon to produce copies of contracts and invoices relating to work at the State Capitol. At a meeting in Springfield, Hodge asked petitioner if he would prepare invoices to support the vouchers and warrants issued to Fabric-Crafts. Lydon agreed to do so to the extent of $50,000. The necessary invoices and contracts were prepared. Hodge gave $50,000 to Epping who transmitted it to the petitioner. Lydon put this $50,000 in a safe deposit box in Southmoor. It was later seized by the state so this sum is not at issue in this suit.

During the May 1956 term of the Sangamon County Circuit Court of Illinois, Hodge was indicted on the charge of obtaining $600,000 by means of some fifty-two warrants.

Because of Hodge's poor physical condition, his attorney advised him to plead guilty to any transactions which he did not have the evidence to categorically disprove. Hodge accepted the advice believing the length of his sentence would not be materially increased due to additional transactions. Hodge pleaded guilty to all counts of the indictment. Some of the counts involved transactions here in dispute.

In the September 1956 term of the same court, petitioner Lydon was indicted

on seven separate warrants of conspiracy with Hodge, Epping and Hintz to obtain money from the treasury of the State of Illinois by false pretenses. A jury returned a guilty verdict. Petitioner was fined $2,000.

In the September 1961 term of the United States District Court for the Northern District of Illinois, Eastern Division, and after a jury trial, petitioner was acquitted of the charge of criminal tax evasion for the years 1953, 1954 and 1955.

There can be no dispute that the State of Illinois was overcharged by Mitchell-David and Fabric-Crafts. Also, there is no dispute that the warrants here in question were cashed by Lydon and he was in possession of the profits therefrom.

Lydon claimed he was an innocent instrument in Hodge's defalcations. He implies that he was merely a conduit through which the funds for Hodge passed.

■ Petitioner argues that great weight should be given to the jury verdict acquitting him of charges of criminal tax evasion for the years 1953, 1954 and 1955 in the United States District Court for the Northern District of Illinois, Eastern Division. However, a jury verdict acquitting a taxpayer in a criminal case has no binding effect in a civil fraud proceeding. Different standards of proof are involved. Helvering v. Mitchell, 303 U.S. 391, 58 S.Ct. 630, 82 L. Ed. 917.

■ Petitioner says that he was merely an accommodating endorser for Hodge and that he made no claim of right to the proceeds. However, it seems obvious that the funds received should have been reported whether or not the proceeds were for services rendered. We think the petitioner received gross income under § 22(a) of the 1939 Code and under § 61(a) of the 1954 Code.

Petitioner personally received the illegally obtained money. "An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it." Rutkin v. United States, 343 U.S. 130, 137, 72 S.Ct. 571, 575, 96 L.Ed. 833.

Petitioner argues the Tax Court may not arbitrarily disregard testimony of a taxpayer which is uncontradicted, but here, Orville Hodge, as a witness, directly denied he had ever asked Lydon to cash any state warrants and to turn the proceeds over to him (Hodge). He also specifically denied that he received any of the proceeds of the warrants hereinbefore described. He testified—"Mr. Lydon never advanced any cash for me."

■ Thus, a question of credibility was before the Tax Court. Resolving the direct conflict between witnesses Hodge and Lydon was a matter for the Tax Court.

■ The Commissioner's determination of deficiencies is presumptively correct, and the burden is on the taxpayer to prove the Commissioner's determination is erroneous. Welch v. Helvering, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212; Zeddies v. Commissioner of Internal Revenue, 7 Cir., 264 F.2d 120, cert. den. 360 U.S. 910, 79 S.Ct. 1295, 3 L.Ed.2d 1260, rehearing denied 361 U.S. 855, 80 S.Ct. 44, 4 L.Ed.2d 94.

■■ Petitioner strongly urges that a fraud penalty should not have been assessed under the facts of this case, and points out that civil fraud depends solely on taxpayer's intent. He cites the well known rule that the burden of proving fraud is on the respondent commissioner.

■ Whether a taxpayer's omission of income in his tax returns is due to fraud with intent to evade tax, is a question of fact for the Tax Court to determine. Mensik v. Commissioner of Internal Revenue, 7 Cir., 328 F.2d 147; Teitelbaum v. Commissioner of Internal Revenue, 7 Cir., 294 F.2d 541.

■ Consistent and substantial understatements of income over a period of several consecutive years in the light of all the circumstances, may be clear and

convincing evidence of fraud. Teitelbaum v. Commissioner of Internal Revenue, supra; Bender v. Commissioner of Internal Revenue, 7 Cir., 256 F.2d 771.

It is well established that if any part of a deficiency is due to fraud with an intent to evade tax, a penalty of 50% of the total amount of the deficiency may be assessed. Mensik v. Commissioner of Internal Revenue, supra; Jaeger Motor Car Company v. Commissioner of Internal Revenue, 7 Cir., 284 F.2d 127, 129.

Another item vigorously disputed by the taxpayer is the Commissioner's determination of a longterm capital gain of $25,981.84 in 1954 from the sale of his shares of Mitchell-David stock. The Tax Court affirmed the Commissioner's determination both as to taxpayer's basis in the shares he sold ($5,465) and as to their selling price ($31,446.84), and consequently, as to the amount of the longterm capital gain. We hold the Tax Court was correct.

We also approve the Tax Court's holding in affirming the Commissioner's finding that taxpayer received taxable income in 1955 of $281.24 from interest resulting from the sale of his Mitchell-David stock.

Another issue much in dispute is the disallowance of $2,637.96 of the amount deducted by taxpayer on his 1955 return as a business expense. Taxpayer says that each of the sums included in that amount is supported by invoices and cancelled checks and is a regular and proper cost of doing business.

In order for expenses to be deductible under § 162, Internal Revenue Code of 1954, subd. a, such expenses must be both ordinary and necessary and must have a direct relation to the particular business.

It is true that cancelled checks of Fabric-Crafts signed by petitioner are in evidence. They show the amount in question included a check for acoustical tile furnished to Edward Epping at Lebanon, Illinois; a check for draperies furnished to Epping at Lebanon and one for carpets and draperies furnished by Trend Floor Covering, Inc., to Mrs. Edward Epping. Taxpayer offered no evidence to show these payments were ordinary, necessary or were, in any way, related to his trade or business.

As deductions are a matter of legislative grace, a taxpayer who claims such benefit must prove he comes within the terms of the statute allowing the deduction. New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440, 54 S.Ct. 788, 78 L.Ed. 1348; Ashcraft v. Commissioner of Internal Revenue, 7 Cir., 252 F.2d 200, 205.

Other contentions have been made which we have examined. It would unduly lengthen this already long opinion to discuss them in detail. However, as to each of them, we have concluded that the determination of the Tax Court must be sustained.

We hold that the Tax Court is correct on all issues and is hereby

Affirmed.