HARVEY A. LUDWIG and BEVERLY LUDWIG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ludwig v. Commissioner
Docket No. 8088-79.
United States Tax Court
T.C. Memo 1983-678; 1983 Tax Ct. Memo LEXIS 113; 47 T.C.M. (CCH) 287; T.C.M. (RIA) 83678; November 10, 1983. Austin J. Doyle, Jr. and Richard H. Champion, for the petitioners. Kathleen E. Whatley, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes: Addition to Tax
Year
Deficiency
Sec. 6653(b) [1]
1974
$55,895.74
$28,346.37
1975
38,203.80
20,889.40
*114 By amended answer, respondent redetermined deficiencies [2] and additions to petitioners' Federal income taxes for the years in issue as follows: Addition to Tax
Year
Deficiency
Sec. 6653(b)
1974
$55,065.00
$27,931.00
1975
39,066.00
21,314.00
After concessions, the issues for decision are: (1) Whether the fair market value of bearer bonds received by Harvey A. Ludwig during 1974 and 1975 constitute taxable income to the petitioners for their 1974 and 1975 taxable years; (2) If the bonds are determined to constitute taxable income to petitioners, on what date are the first set of bonds so includable [3]; (3) Whether petitioners are liable for the fraud addition to tax under section 6653(b) for the years in issue; and (4) Whether the statute of limitations bars assessment and collection of the deficiencies determined by respondent for petitioners' 1974 taxable year.
*115 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Harvey A. Ludwig (hereinafter petitioner) and Beverly Ludwig, husband and wife, resided in Shaker Heights, Ohio, when they filed their petition in this case. They filed joint Federal income tax returns for the years in issue with the Internal Revenue Service Center, Cincinnati, Ohio. Thoughout the years in issue petitioner was Chairman of the Board, Chief Executive Officer, and a Director of Tenna Corporation (hereinafter Tenna), an Ohio corporation, which was engaged in the assembly and sale of automotive accessories. Tenna had offices or assembly plants in Alabama, Ohio, Japan, Puerto Rico, Dominican Republic, France, and Canada. Tenna's principal executive office was located in Warrensville Heights, Ohio. On May 3, 1972, petitioner met with William Gohlke, Senior Vice President of Marketing, for Seatrain Lines, Inc. (hereinafter Seatrain), who offered to give Tenna rebates on the established shipping rates if Tenna would utilize Seatrain's ships for its Pacific freight. Petitioner liked Gohlke's proposal, and he instructed Max Kay, Tenna's Traffic Manager, to negotiate an agreement *116 with Seatrain. On June 29, 1972, Max Kay and Seatrain's representatives agreed that Tenna would ship all of its Japanese freight on Seatrain vessels in exchange for a rebate of approximately 28 percent of Seatrain's published conference rates. Shortly thereafter, petitioner advised Tenna's Executive Committee that the rebate agreement with Seatrain had been concluded and Tenna began shipping cargo via Seatrain. At approximately this time, petitioner instructed both Max Kay and Donald Vanke, Tenna's Vice President of Finance, to maintain records of Tenna's Seatrain shipments. [4] Between September 1972 and January 1973, copies of Max Kay's records were forwarded to Seatrain as a reminder of the amount it owed Tenna under their agreement, although Seatrain never made any rebate payments throughout this period. In January 1973, petitioner advised Vanke to reflect the unpaid rebates in Tenna's reserves, but Vanke informed petitioner that they could not be reflected in Tenna's reserves and they never were recorded on Tenna's books. In January 1973, petitioner advised Tenna's officers *117 that he would personally handle all Seatrain matters, and he directed Max Kay and Donald Vanke to meet with Seatrain's representatives for the purpose of securing the rebate payments that had accrued to date. On May 9, 1973, petitioner, Ronald White (Tenna's President), Donald Vanke, and Stanley Goss met with Seatrain's representatives to discuss the manner in which the rebates could be paid. No agreement was reached during this meeting and at some undetermined point not later than June 1973, [5] petitioner and the other members of Tenna's Board of Directors learned that acceptance of rebates by an American corporation is illegal under the Shipping Act of 1916, 39 Stat. 728, 734 (as amended 10/3/61), Title 46 USC § 815 (hereinafter the Shipping Act of 1916). At approximately the same time that petitioner learned that acceptance of rebates by a U.S. corporation is illegal, Tenna's Japanese counsel advised that Tenna's Japanese subsidiary could legally accept the rebates, and the parties discussed the possibility of paying the rebates to the Japanese subsidiary. Tenna rejected this idea because the rebates could not properly be reflected on the subsidiaries' *118 books and, more importantly, Tenna needed the rebates to appear on the books of the U.S. parent corporation to improve its declining corporate earnings and profits. [6]
*119 On June 6, 1973, Tenna's President, Ronald White, aware of the rebate's illegality, advised petitioner in writing that there was no way in which the Seatrain rebates legally could be accepted and that he wanted the matter of the rebates discontinued.On January 22, 1974, Ronald White again advised petitioner in writing not to accept rebates from Seatrain. [7] Notwithstanding White's advice, petitioner continued to seek payment of the rebates, and in subsequent discussions with Arthur Novacek, President of Seatrain's Container Division, petitioner requested that the rebates be paid in the form of bearer bonds. Seatrain agreed to the proposed method of payment and on February 27, 1974, petitioner sent Max Kay to a brokerage firm in New York City where he was given a package containing sixty-five *120 $1,000 face value bearer bonds issued by the Florida Power and Light Company (hereinafter the first set of bonds). Kay delivered these bonds to petitioner who placed them in the company safe. Within a few weeks, at some point in March 1974, petitioner removed the bonds from the company safe, took them home, and placed them in a drawer in his dressing room. During this time, no one at Tenna other than Max Kay and petitioner's secretary, Janice Zolnowski, knew that petitioner had received these bonds, and petitioner took no steps to inform any officers or employees of Tenna that he had received the bonds. On June 4, 1974, petitioner moved into a new personal residence that he purchased on November 29, 1973, at a cost of $237,116. The house required extensive renovations and between 1973 and 1976 petitioner sold approximately $700,000 of his stocks and bonds to finance the renovations made to this house although he did not sell any of the bonds he received from Seatrain. On July 23, 1974, petitioner sent Max Kay to Seatrain's Weehawken, New Jersey office where he obtained $77,000 face value AT&T bearer bonds (hereinafter the second set of bearer bonds). Max Kay delivered these *121 bonds to petitioner who immediately took them home. Not wishing to keep $142,000 in bearer bonds in his house, petitioner gave the first and second sets of bonds to his wife who deposited them in her personal safety deposit box. [8] When petitioner gave these bonds to his wife he did not tell her that they belonged to Tenna, that he was holding them on behalf of Tenna, or that she was not supposed to clip the interest coupons attached to the bonds which was her normal practice to do. On December 3, 1974, Beverly Ludwig clipped the bond interest coupons on the first set of bonds and deposited the $1,503.45 proceeds in her personal checking account. [9]
On or about April 14, 1975, petitioners *122 filed their joint 1974 Federal income tax return on which they reported income from wages, dividends, and interest in the amount of $55,083. [10] In preparing their returns, it was the petitioners' usual practice to have Mrs. Ludwig go through her checkbook, bills, and receipts to make a list of their expenses. Mrs. Ludwig would then give this list and the attached receipts to petitioner who forwarded it along with their other tax records to their accountant who then prepared petitioners' returns. Petitioners generally maintained accurate and complete tax records throughout the years in issue. Petitioner calculated his income from his Form W-2, and the year-end statements supplied by his banks, brokerage firm, and companies in which he or Mrs. Ludwig owned stock. Although petitioner was aware that the first and second sets of bonds had *123 interest coupons attached, he did not provide his accountant with any information pertaining to the $142,000 face value bearer bonds that he received during 1974.Petitioners' original 1974 Federal income tax return did not include any amounts attributable to the $142,000 face value bearer bonds nor the $1,503.45 in coupon interest deposited in Mrs. Ludwig's checking account during 1974. On May 15, 1975, petitioner was interviewed by Special Agent John I. Burns of the United States Bureau of Customs in connection with an investigation into Seatrain's payment of rebates to Tenna. During this interview, petitioner denied under oath having any knowledge of the receipt of kickbacks or rebates from Seatrain by Tenna, Max Kay, or himself. Two weeks later, on May 29, 1975, while petitioner was in Geneva, Switzerland, attending an automobile show, he received a package at his hotel containing nineteen $1,000 face value bearer bonds issued by AT&T and fourteen $1,000 face value bearer bonds issued by the New York Telephone Company (hereinafter the third set of bonds). On the following day, petitioner opened a personal bank account at the Union Bank of Switzerland where he placed the third *124 set of bonds. Shortly thereafter, petitioner was contacted by Neal Nunnelly of Seatrain who inquired whether petitioner had received the third set of bonds and who advised that he would be mailing an additional $60,000 in bonds in $5,000 packets to petitioner's home. [11]
From approximately July 7, 1975 to July 25, 1975, twelve registered packages, each containing five $1,000 face value AT&T bearer bonds (hereinafter the fourth set of bonds) were delivered to petitioner's personal residence from Rotterdam, The Netherlands. As each package arrived, petitioner opened it and placed the bonds in his dresser drawer. When all twelve packages had been received, petitioner gave them to his wife who deposited them in her safe deposit box. As with the first two sets of bonds, petitioner never told her that the bonds belonged to Tenna, that he was holding the bonds for Tenna, or that she should not clip the interest coupons. During the 1975 taxable year, Mrs. Ludwig clipped the matured coupons on the $202,000 face value bonds in *125 her safe deposit box and $7,542.50 in coupon interest was deposited in her personal checking account. In computing their 1975 Federal income tax liability, petitioners did not provide their accountant with any information regarding petitioner's receipt of $93,000 face value bearer bonds during 1975. Petitioners' original 1975 Federal income tax return did not include any amounts attributable to the $93,000 face value bearer bonds, nor the $7,542.50 in coupon interest deposited in Mrs. Ludwig's personal checking account during 1975. Petitioner, as Chief Executive Officer, knew that Tenna never reported the bonds or the coupon interest on its corporate income tax returns during either calendar year 1974 or 1975. From his receipt of the first set of bearer bonds in February 1974, until September 1975, petitioner took no steps to inform any officers or employees of Tenna that he had received $235,000 face value bearer bonds from Seatrain. In September 1975, petitioner sought legal advice regarding the bearer bonds from the attorney who was both Tenna's corporate counsel and petitioner's personal attorney, although what advice petitioner sought or obtained from him at that time *126 is not disclosed. In late June 1976, petitioner informed Tenna's President and Board of Directors that he had received $235,000 in bearer bonds from Seatrain and he offered them to Tenna. Tenna refused the bonds and petitioner subsequently delivered the first, second, and fourth sets of bonds to the United States Bureau of Customs Special Agent John I. Burns, on July 14, 1976. [12]
By letter dated September 27, 1976, petitioner was advised by counsel [13] to file amended tax returns for their 1974 and 1975 taxable years. On October 7, 1976, petitioner was advised by the Intelligence Division of the Internal Revenue Service that his returns for taxable years 1972, 1973, 1974, and 1975 were under investigation. On October 8, 1976, petitioner filed amended returns for taxable years 1974 and 1975 including thereon as additional taxable income the coupon interest collected by Mrs. Ludwig from the bonds deposited in her safe deposit box. [14]
*127 On May 1, 1978, in the United States District Court for the Northern District of Ohio, Eastern Division, petitioner plead guilty and was convicted of conspiracy to violate the Shipping Act of 1916. Petitioner was given a suspended two-year sentence and fined $10,000. In the notice of deficiency, respondent determined that petitioners understated their taxable income for their 1974 and 1975 taxable years by failing to include in income the fair market value of the bonds that petitioner had received from Seatrain. Furthermore, respondent determined that a part of the underpayment for each of petitioners' taxable years in issue was due to fraud, and, therefore, he imposed the 50 percent addition to tax for fraud under section 6653(b). The following table shows the taxable income as reported on petitioners' joint original and amended returns, their taxable income as determined by respondent in his amended answer, and the amount of unreported taxable income determined by respondent: Taxable Income
Taxable Income [15]
Unreported Taxable
Reported by
as Determined
Income as Determined
Year
Petitioners
by Respondent
by Respondent
1974
$56,586
$148,307.25
$91,721.25
1975
76,644
140,811.50
64,167.50
*128 ULTIMATE FINDINGS OF FACT Petitioners underreported taxable income for both of the years in issue. Part of petitioners' underpayments of tax for each of the years in issue was due to fraud with intent to evade tax within the meaning of section 6653(b). OPINION *129 We must determine whether petitioners are liable for deficiencies and additions to tax as determined by respondent for the years in issue. Issues 1 and 2: Deficiencies and Date of Inclusion
Respondent maintains that the fair market value of the $235,000 face value bearer bonds were income to petitioners when received by petitioner, Harvey Ludwig, in four installments during 1974 and 1975. Petitioner, on the other hand, argues that he is not properly taxable on the fair market value of the bearer bonds because he was holding them as an agent for Tenna, and that Tenna is properly taxable on the fair market value of the bonds. It is well settled that a taxpayer who receives amounts under a claim of right or without restrictions as to its disposition must include such amounts in gross income. North American Oil Consolidated v. Burnet,286 U.S. 417 (1932). That the amounts received under a claim of right are in the nature of kickbacks or rebates does not alter the fact that they constitute income to the recipient. Lydon v. Commissioner,351 F. 2d 539 (7th Cir. 1965), *130 affg. a Memorandum Opinion of this Court. As the Supreme Court stated in Rutkin v. United States,343 U.S. 130, 137 (1952) "An unlawful gain * * * constitutes taxable income when its recipient has such control over it that * * * he derives readily realizable economic value * * *." Where, however, a taxpayer acts as an agent or mere conduit for the funds, the existence of the claim of right is negated and the amounts received are not income. Goodwin v. Commissioner,73 T.C. 215, 230 (1979); Diamond v. Commissioner, 56 T.C. 530, 541 (1971), affd. 492 F. 2d 286 (7th Cir. 1974); Heminway v. Commissioner,44 T.C. 96 (1965). [16]
On the record in this case, we are convinced that petitioner did not receive the bonds as an agent or conduit, but that he had such control over the bonds that he is properly taxable on the fair market value of the bonds. In support of his argument that he was acting as an agent for Tenna, petitioner testified at trial that throughout the years in issue he continuously sought a method to legally reflect *131 the bonds on Tenna's books. This testimony directly contradicts statements that petitioner made under oath to the Securities and Exchange Commission (SEC) on July 28, 1976. Our review of the evidence convinces us that petitioner did not seek any legal advice with respect to reflecting the bonds as an asset of Tenna between June 1973, when he was notified that acceptance of the rebates was illegal, and June 1976, when he first offered the bonds to Tenna.[17] We believe that petitioner saw an opportunity to personally collect money due a failing company under circumstances that would give him unfettered control over the funds: on the one hand Seatrain would be paying the rebates to Tenna's Chief Executive Officer and Board Chairman in accordance with their prior agreement and they would not question his right to collect the funds; while on the other hand, Tenna's President had specifically repudiated any effort to collect the rebates and did not anticipate their receipt or notice their absence. *132 The factors which typically indicate the existence of an agency or conduit relationship are wholly lacking in this case.Generally, prompt transmittal of the funds to the purported principal is suggestive of an agency or conduit status. Lashells' Estate v. Commissioner,208 F. 2d 430, 435 (6th Cir. 1953). In the instant case, petitioner received the first set of bonds in February 1974, but he did not offer them to Tenna until June 1976, almost two and a half years after he received them and after he had been interviewed several times by the IRS, the SEC, and U.S. Customs with respect to these bonds. Further evidence that petitioner was not acting as an agent or conduit for Tenna is suggested by Tenna's lack of knowledge before June 1976 that petitioner had received the rebates. Riverfront Groves, Inc. v. Commissioner,60 T.C. 435, 446 (1973). Prior to petitioner's acceptance of the rebates Tenna's President twice told him to stop seeking the rebates because they could not legally be brought into the company. Notwithstanding the President's express statements to stop seeking the rebates, petitioner continued to negotiate for their receipt. Once *133 petitioner succeeded in obtaining the rebates, however, he never advised any officers or employees of Tenna that he received the bonds. A purported agency relationship in which a purported principal is unaware of the transaction out of which the agency grows is indeed suspect. Riverfront Groves, Inc. v. Commissioner,supra.
In addition, there was no restriction on petitioner's use of the economic benefits of the bonds.Throughout the years in issue, Beverly Ludwig regularly clipped the coupons from the bonds in her safe deposit box and deposited them in her personal checking account. Petitioners' assertion that they realized neither gain nor economic benefit from the bonds is totally fallacious and strains credulity since they deposited and personally consumed in excess of $9,000 in bond coupon interest throughout the years in issue. It was only by having control over the bonds that allowed petitioners the opportunity to obtain and utilize the coupon interest. Since petitioners admit they are taxable on the bond coupon interest, they cannot seriously contend that they are not taxable on the fair market value of the underlying bonds that gave rise to that interest. *134 See Helvering v. Horst,311 U.S. 112, 121 (1940); Lucas v. Earl,281 U.S. 111 (1930). %petitioner's receipt of the economic benefits from the bonds is totally at odds with the claim that he was merely holding them on Tenna's behalf. Finally, petitioner's receipt of the third set of bonds in Switzerland is highly suspect since it strongly suggests that petitioner was trying to conceal the bonds from his purported principal. Petitioner easily could have opened an account in Tenna's name or otherwise have designated the bonds as belonging to Tenna but he simply opened a personal account and deposited the bonds with the Swiss bank. Petitioner's argument that he could not send the bonds to the U.S. because of a U.S. Customs rule requiring that negotiable instruments with a value in excess of $5,000 be declared is meritless. The third set of bonds consisted of thirty-three separate $1,000 face value bonds which could have been mailed to his home or work in packets of $5,000 each, just like the fourth set of bonds that were mailed to his home from Rotterdam, The Netherlands, in twelve packets of $5,000 each. Clearly, therefore, petitioner does not *135 come within the agent or conduit exception and he is taxable on the fair market value of the bonds and the associated coupon interest. [18]
Having determined that petitioner is taxable on the fair market value of the bonds, a subsidiary issue is the date on which the first set of bonds are includable in petitioner's income. We believe that the first set of bonds were taxable income to petitioner on the date that he assumed complete dominion and control over them by taking them from the corporate safe and placing them in his dresser drawer [19] during March 1974. Until petitioner took the bonds home, they were in Tenna's possession and control and conceivably were for Tenna's benefit, notwithstanding that petitioner knew that acceptance of rebates was illegal and that Tenna's President had expressly told petitioner to stop seeking payment *136 of the rebates. Because we have determined that petitioners had additional unreported taxable income during the years in issue, a Rule 155 computation will be necessary to redetermine petitioners' 1975 medical expense deduction. Issues 3 and 4: Addition to Tax and the Statute of Limitations
Respondent determined that part of petitioners' underpayment of tax for each of the years at issue was due to fraud and, therefore, claims that the section 6653(b) fraud addition to tax should be imposed. Petitioner denies that any underpayment of tax was due to fraud. For the reasons set forth below, we hold for respondent on this issue. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. *137 Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion, 578 F. 2d 1383 (8th Cir. 1978). Respondent has the burden of proving fraud for each year that it is alleged by clear and convincing evidence. Sec. 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Cefalu v. Commissioner,276 F. 2d 122, 128 (5th Cir. 1960); Beaver v. Commissioner,55 T.C. 85, 92 (1970). The taxpayer nust be shown to have acted with the specific intent to evade a tax believed to be owing. Mitchell v. Commissioner,118 F. 2d 308, 310 (5th Cir. 1941); Estate ofTemple v. Commissioner,67 T.C. 143, 159 (1976). Since direct evidence of fraud is seldom available, respondent may meet his burden of proof through circumstantial evidence. Nicholas v. Commissioner,70 T.C. 1057, 1065 (1978). We have found that petitioner failed to report substantial amounts of income from his receipt of rebates that he ostensibly collected on behalf of Tenna but which he converted to his own use. We based this finding on the substantial evidence contained in the record *138 including petitioner's failure to advise anyone on Tenna's Board that he had received the bonds, his placing of the bonds in his wife's safe deposit box and a personal Swiss bank account, Mrs. Ludwig's clipping of the matured coupons in her possession and depositing of the rpoceeds in her personal checking account and the use of these proceeds for personal purposes. These factors lead us to conclude that respondent has shown by clear and convincing evidence that petitioner had substantial unreported income from his use and control of the bonds received from Seatrain. It is well settled that a consistent failure to report substantial amounts of income over a number of years is effective evidence of fraudulent intent. Gromacki v. Commissioner,361 F. 2d 727 (7th Cir. 1966), affg. a Memorandum Opinion of this Court; Kalil v. Commissioner,271 F. 2d 550 (5th Cir. 1959), affg. a Memorandum Opinion of this Court. On petitioner's original return they failed to report either the fair market value of the bonds or the coupon interest obtained from the bonds which *139 was deposited in Mrs. Ludwig's personal checking account. During each of the years in issue petitioners reported interest and dividend income in excess of $4,000 and they obviously were aware that interest and dividends constitute taxable income. Moreover, petitioner owned several hundred thousand dollars in stocks and bonds and he was an intelligent businessman who clearly knew that the bonds constituted taxable income. Petitioners' failure to report the bonds or the coupon interest as taxable income suggests that they intended to evade a tax believed to be owing. Mitchell v. Commissioner,supra.Although petitioners subsequently filed amended returns reporting the coupon interest, the amended returns still failed to include in income the fair market value of the bonds. [20]
Further evidence of petitioner's fraudulent intent is evidenced by the concealment of the third set of *140 bonds in his personal Swiss bank account. Friedman v. Commissioner,421 F. 2d 658 (6th Cir. 1970), affg. a Memorandum Opinion of this Court; Beaver v. Commissioner,supra at 93 ("willful attempt to evade tax may be found from any conduct calculated to mislead or conceal.") Finally, petitioner's denial of any knowledge of the rebates to the United States of Customs investigator in May 1975, after petitioner had received $142,000 face value bearer bonds clearly illustrates an intent to mislead and conceal receipt of the bonds which, when coupled with his failure to report the bonds in income, smacks of fraudulent intent sufficient to trigger the section 6653(b) addition to tax. Consequently, notwithstanding petitioners' arguments to the contrary, we hold that respondent has established that petitioners are liable for the fraud addition to tax for each of the years in issue. Having found that petitioners filed false and fraudulent returns with the intent to evade taxes for both years in issue, respondent's notice of deficiency clearly was not barred by the statute of limitations. See section 6501(c)(1) and (2). To reflect the foregoing *141 and to allow a recomputation of petitioners' 1975 medical expense deduction, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
2. See n. 15.↩
3. In the event we find that petitioners received unreported taxable income during 1975, a Rule 155 computation will be necessary to redetermine petitioners' 1975 medical expense deduction.↩
4. Donald Vanke maintained the requested records from June 1972 through December 1974.↩
5. As of at least March 7, 1973, Tenna's corporate counsel, who also served on Tenna's Board of Directors, was aware that the rebates were illegal under the Shipping Act of 1916, 39 Stat. 728, 734 (as amended 10/3/61), Title 46 USC § 815↩, and at some point between March 1973 and June 1973 he so advised petitioner and the other members of Tenna's Board. On March 7, 1973, Tenna's corporate counsel possessed a copy of an article taken from the March 5, 1973, Wall Street Journal entitled "Seatrain Is Charged With Giving Favors to Certain Shippers." The article was subtitled "Justice Unit Asserts Line Used Illegal Discounts and Rebates to Undercut Formal Tariffs." The article referred to a $5,000 criminal penalty for each violation of the 1916 Shipping Act and it stated that William Gohlke was among those charged with giving illegal discounts and rebates. 6. Between 1969 and 1973 Tenna's fortunes declined from a $3 million annual profit to a $1.4 million annual loss, and throughout the years in issue, Tenna's losses continued to mount at an accelerating rate.↩
7. In a memo dated January 22, 1974, Ronald White wrote to petitioner: "Please acknowledge by your signature hereon that I have advised against and am not in agreement with the acceptance of rebates from Seatrain." Petitioner signed this memo on January 28, 1974, approximately one month before he received the first of four installments of bearer bonds in payment of the Seatrain rebates.↩
8. This safe deposit box was rented by Mrs. Ludwig in November 1957. Petitioner was an authorized deputy of Mrs. Ludwig and had equal access to the safe deposit box. On March 12, 1975, Mrs. Ludwig also made Gertrude Goldfarb a deputy with access to the safe deposit box. ↩
9. Beverly Ludwig kept meticulous records of her checking account deposits and expenditures. After each of the bond interest deposits she wrote either "Bonds," or the name of the specific bond from which the coupons had been clipped.↩
10. Petitioners' taxable income includes a $3,759 loss from the sale or exchange of capital assets. Schedule D of petitioners' 1974 Federal income tax return (Capital Gains and Losses) reflects a $2,601 long-term capital gain from the sale of land, and a $77,833 long-term capital loss from the sale of land and other stocks and securities.↩
11. The parties believed that negotiable instruments mailed to the United States with a value of $5,000 or less did not have to be declared in U.S. Customs.↩
12. The remaining $33,000 face value bonds were mailed to United States Attorney James R. Williams on February 7, 1979, by petitioner's counsel, David N. Webster, from petitioner's personal Swiss bank account.↩
13. In approximately May 1976, petitioner's counsel suggested to petitioner that he hire David N. Webster to represent him in connection with the various investigations and other proceedings involving Seatrain's rebate payments. Mr. Webster suggested that petitioner file the amended tax returns.↩
14. See n. 15.↩
15. Respondent determined the amount of petitioners' unreported taxable income by including in income the fair market value of bearer bonds that petitioner received during each of the years in issue. Subsequent to the mailing of the notice of deficiency and the filing of his original answer herein, respondent discovered that petitioners had improperly calculated the bond coupon interest reported on their 1975 income tax return by $905.50. In addition, respondent discovered that the original notice of deficiency improperly determined the fair market value of the bearer bonds as of the end of the month prior to the month that petitioner received the bonds. The parties have stipulated that the proper valuation date is the end of the month in which petitioner received the bonds. Respondent, therefore, decreased petitioners' omitted income adjustment for 1974 by $1,287.50, and increased it for 1975 by $171.25.↩
16. Shaara v. Commissioner,T.C. Memo. 1980-247↩.
17. When petitioner was interviewed by the SEC on July 28, 1976, in regard to Tenna's acceptance of rebates, petitioner stated under oath that after he was told that acceptance of rebates carried a $5,000 penalty he never sought legal advice with respect to reflecting the rebates in Tenna's books during the years in issue. We note, however, that the parties have stipulated that petitioner told his attorney about his receipt of the rebates in September 1975, although we have no information regarding the nature of the advice that petitioner sought or obtained at that time.↩
18. We note that respondent has not attempted to tax petitioners on the matured coupon interest belonging to the third set of bonds even though petitioner may have been in constructive receipt of that interest when the coupons matured. Section 1.451-2(b), Income Tax Regs.↩ This issue has not been raised by the parties.
19. At trial petitioner claimed that he took the bonds home for safe keeping because approximately thirty people had access to the corporate safe. We fail to see how petitioner could believe that his dresser drawer was a more secure location than a corporate safe especially when no more than three of Tenna's employees were aware of the bond's existence.↩
20. The subsequent filing of amended returns, cannot eliminate imposition of the 50 percent fraud addition to tax on the original return where respondent proves fraud by clear and convincing evidence. Plunkett v. Commissioner,465 F. 2d 299, 303↩ (7th Cir. 1972).