JEROLD DEAN KLING, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kling v. Commissioner
Docket No. 6717-88
United States Tax Court
T.C. Memo 1990-284; 1990 Tax Ct. Memo LEXIS 302; 59 T.C.M. (CCH) 818; T.C.M. (RIA) 90284; June 7, 1990, Filed *302 Decision will be entered under Rule 155. Jerold Dean Kling, pro se. Randall L. Preheim, for the respondent. RUWE, Judge. RUWE
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies and additions to tax in petitioner's Federal income taxes as follows: Additions to Tax
Year
Deficiency
Sec. 6653(b)(1) [1]
Sec. 6653(b)(2)
Sec. 6661
1984
$ 23,351
$ 11,675
50 percent of
$ 5,838
the interest
due on $ 23,351
1985
6,687
3,344
50 percent of
1,672
the interest
due on $ 6,687
*303 At trial, respondent conceded the additions to tax for fraud. The issues for decision are: (1) Whether petitioner received unreported income for the taxable years 1984 and 1985 in the amounts of $ 65,640 and $ 29,625, respectively; and (2) whether petitioner is liable for the additions to tax, as determined by respondent, under section 6661 for taxable years 1984 and 1985. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Jerold Dean Kling, petitioner, resided in Scottsbluff, Nebraska at the time he filed his petition in this case. He timely filed joint Federal income tax returns for taxable years 1984 and 1985. During 1984 and through June 1985, petitioner was employed *304 by Panhandle Cooperative Association of Scottsbluff, Nebraska (Panhandle) as the manager of its tire shop. During 1984, the tire shop at Panhandle had tire sales of at least $ 500,000. As the manager of the tire shop, petitioner worked approximately eight to nine hours a day, six days a week. He supervised approximately six or seven employees. The tire shop at Panhandle sold new and used tires. More than one-half of the tires sold were recapped tires. The tire shop acquired recappable used tires from customers and other persons. Some of these used tires were acquired as trade-ins on customer purchases. If used tires were acquired as a trade-in, the amount of the trade-in was shown as an "exchange" on the customer's bill and the amount of the "exchange" was deducted therefrom. Petitioner and his assistant manager were responsible for determining the trade-in allowance. Most of the used tires that Panhandle acquired were purchased directly from customers. Petitioner was responsible for determining the price that Panhandle would pay for the used tires. Payment for used tires was made pursuant to the following procedure. Petitioner prepared purchase invoices/vouchers (vouchers) *305 in his office at the tire shop. The vouchers contained the customer's name and address, quantity and size of the tires purchased, and the purchase price. Once the voucher was prepared, either petitioner or his brother, Gordon Kling, who was also employed in the tire shop, would take the voucher to the main office at Panhandle, where a check would be issued and made payable to the customer. Respondent determined that petitioner received unreported income in 1984 and 1985 as a result of checks issued by Panhandle in response to 145 specifically identified vouchers. Petitioner prepared these 145 vouchers, which purport to show purchases of used tires from customers, and submitted them for payment to Panhandle. With respect to these 145 vouchers, Panhandle issued checks for each voucher. Of these 145 vouchers, petitioner prepared and submitted 103 vouchers to Panhandle during 1984, causing Panhandle to issue checks aggregating $ 65,640. The remaining 42 vouchers were prepared and submitted by petitioner to Panhandle during 1985, causing Panhandle to issue checks aggregating $ 29,625. Most of the checks issued pursuant to these 145 vouchers were cashed by petitioner at the local grocery *306 store. An accountant at Panhandle became suspicious of these 145 vouchers, because the individuals named on the vouchers did not have vendor identification numbers at Panhandle. An executive officer at Panhandle reported a suspected embezzlement scheme to the Scottsbluff Police Department. Detective Lieutenant Kinsey performed an investigation into the suspected embezzlement. The last names of some of the customers named on the 145 vouchers matched those of individuals known to exist. Detective Kinsey personally contacted these individuals and discovered that they had not sold the used tires shown on the vouchers. With respect to the remaining unknown individuals, Detective Kinsey compiled a list of all the names and addresses and then sent a letter to each postmaster in each community and asked the postmaster to check their records to determine if the named individual lived at that address. The names did not appear in any postal records. Of the 103 vouchers prepared by petitioner during 1984, three showed the seller as Sally Saunders and one showed the seller as Sally Meyer. These were names used by petitioner's girlfriend, Sally Burlingame. During February and March 1984, *307 Panhandle issued four checks totalling $ 1,900 as a result of these four vouchers. At petitioner's direction, Ms. Burlingame endorsed and cashed the checks and gave the proceeds to petitioner. Ms. Burlingame has never sold any tires to Panhandle. Petitioner's 1984 Federal income tax return reflects that he and his spouse received income, net of taxes withheld, in the amount of $ 19,155.74. Petitioner's 1985 Federal income tax return reflects that he and his spouse received income, net of taxes withheld, in the amount of $ 12,715.10. Neither petitioner nor his wife had substantial savings, nor did they receive any substantial gifts during the years in issue. In 1984, and up until June 1985, petitioner maintained a home for his wife and three children in a house that he purchased in 1979 or 1980 for approximately $ 25,000. Petitioner received $ 2,000 from his mother which he used as a down payment. The monthly mortgage payments were approximately $ 240. During 1984 and 1985, petitioner's monthly utility bills were between $ 100 and $ 125, and petitioner spent approximately $ 100 a week on groceries for his family. During March of 1984, petitioner lived in a rented house with *308 Sally Burlingame. [2] He paid for the rent, utilities, and groceries for Ms. Burlingame and her children. Petitioner purchased a stove, refrigerator, washer, dryer, and a television for Ms. Burlingame. In addition, petitioner purchased gifts for Ms. Burlingame and her children which included jewelry, an Atari set for her son, a bicycle for her son's birthday, and a one-half interest in a car. He periodically gave Ms. Burlingame $ 100 to $ 200 for shopping, and also paid for trips that they took together. During 1984 and 1985, petitioner gambled heavily. He would routinely carry $ 500 to $ 1,000 cash on his person. Petitioner played lottery machines at lounges and would gamble between $ 150 and $ 500, every other evening after work. Petitioner was usually accompanied by a few of the employees who worked at the tire shop. Petitioner would purchase drinks for himself as well as for those persons who accompanied him and, in addition, *309 leave generous tips for the bartender. OPINION Respondent determined that petitioner realized embezzlement income for taxable years 1984 and 1985 in the amounts of $ 65,640 and $ 29,625, respectively. Respondent's determination is presumed correct and petitioner bears the burden of proving otherwise. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). Section 61 defines gross income as "all income from whatever source derived." It is well established that gains from illegal sources constitute income under section 61, and that embezzled funds are includable in income to the embezzler in the year in which they are misappropriated. Sec.1.61-14(a), Income Tax Regs.; James v. United States, 366 U.S. 213, 219-220 (1961); Lydon v. Commissioner , 351 F.2d 539 (7th Cir. 1965), affg. a Memorandum Opinion of this Court. Petitioner's only argument is that he did not embezzle money from Panhandle. He argues that there *310 is no evidence in the record showing that he forged endorsements and received the proceeds of the 145 checks issued by Panhandle. Petitioner directs our attention to respondent's expert witness who performed an analysis of the 145 vouchers prepared by petitioner, and the endorsements on the 145 checks that Panhandle issued as a result of these vouchers. Both parties have stipulated that respondent's expert witness is a qualified handwriting expert. Respondent's expert concluded that four of the 145 endorsements on the Panhandle checks are actual signatures, but could not determine whether petitioner authored these four endorsements. Ms. Burlingame testified, however, that she had cashed these four checks, at petitioner's direction, and gave the currency to him. With respect to the endorsements on the other 141 Panhandle checks, respondent's expert concluded that, because they were written in an extremely slow and restricted manner, these endorsements were not signatures but rather drawings. According to respondent's expert, these types of drawings appear when: (1) Someone is trying to copy another person's handwriting; (2) someone is trying to eliminate the characteristics of *311 their own handwriting; or (3) the author has poor handwriting and is an infrequent writer. Respondent's expert, however, was unable to determine whether petitioner participated in the production of the endorsements on these checks. Petitioner argues that because respondent's expert testimony is inconclusive as to whether he endorsed these 141 Panhandle checks, it has not been shown that he received additional income in amounts determined by respondent for taxable years 1984 and 1985. It is petitioner's burden to prove that respondent's determination is incorrect. The testimony of respondent's expert is not in any way inconsistent with respondent's position that the checks in question were improperly endorsed by signing the name of a fictitious payee. Petitioner admitted that he cashed most of the 145 checks at the local grocery store. He claimed that he then gave the proceeds to the person who purportedly sold the used tires. Petitioner did not call any of the purported payees named on the 145 Panhandle checks. [3] We are, therefore, left in large part with only petitioner's uncorroborated self-serving testimony, which this Court need not accept. See Geiger v. Commissioner, 440 F.2d 688 (9th Cir. 1971), *312 affg. a Memorandum Opinion of this Court; Davis v. Commissioner, 88 T.C. 122, 140-141 (1987), affd. 866 F.2d 852 (6th Cir. 1989); Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Nicholas v. Commissioner, 70 T.C. 1057, 1064 (1978). *313 There are affirmative indications that petitioner had additional income during 1984 and 1985. Petitioner testified that his only source of income during 1984 and 1985 was his wages from Panhandle. During the years in issue, petitioner supported a household consisting of his wife and three children, and also made numerous expenditures on behalf of his girlfriend and her children. He would gamble as much as $ 500 an evening on lottery machines at local lounges, and was known to carry $ 500 to $ 1,000 cash on his person. His testimony that he was able to support his lifestyle because he "never lost" when he played the lottery machines is not credible. Petitioner admitted that he received the proceeds of four of the 145 checks issued by Panhandle. According to petitioner, he cashed these four checks because Ms. Burlingame had threatened the lives of his children shortly after their relationship ended by telling him over the telephone that his "boy will never make it home from school one day." In June 1985, petitioner purportedly received another telephone call in which he was told to leave town, but prior to leaving town he was instructed to cash four Panhandle checks and leave *314 the money at a local park approximately one mile outside of Scottsbluff. Petitioner testified that he obtained and cashed four Panhandle checks, and left the currency, approximately $ 2,000, at this local park. Other than his own uncorroborated testimony, petitioner failed to introduce any evidence that he contacted the police about the threats he had received. Ms. Burlingame testified that she had never threatened the lives of petitioner's children. Based upon our observation of the witnesses and considering the content of their testimony, we do not accept petitioner's story that he took this money from his employer in order to turn it over to someone who had threatened his children. We also believe Ms. Burlingame's testimony regarding the four Panhandle checks that were made payable to her in February and March 1984. Those checks, totalling $ 1,900, were given to her by petitioner and pursuant to his instructions she cashed them and returned the proceeds to him. We find that petitioner has failed to meet his burden of proof. Accordingly, we sustain respondent's determination that petitioner realized income from embezzlements in the amounts of $ 65,640 in 1984 and $ 29,625 *315 in 1985. The next issue for decision is whether petitioner is liable for the additions to tax under section 6661. Section 6661 imposes an addition to tax in an amount equal to 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax. [4]Pallottini v. Commissioner, 90 T.C. 498 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return, or $ 5,000. Sec. 6661(b)(1). The amount of the understatement is equal to the excess of the amount of tax required to be shown on the return for the tax year less the amount of the tax shown on the return. Woods v. Commissioner, 91 T.C. 88, 94 (1988). For purposes of calculating the amount of the understatement, withheld taxes are disregarded. Woods v. Commissioner, supra at 95 n.12. *316 To calculate the addition to tax under section 6661, the amount of petitioner's withholding credits must be subtracted from the understatement to determine the amount of any underpayment. Woods v. Commissioner, supra at 99. The deficiencies that we uphold for taxable years 1984 and 1985 qualify as "substantial understatements" as defined in section 6661(b). The provisions for reduction of the section 6661 addition to tax contained in section 6661(b)(2)(B) are not applicable in this case. Accordingly, we sustain respondent's determination that petitioner is liable for the additions to tax under section 6661. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The duration of petitioner's relationship with Ms. Burlingame is unclear.↩
3. Petitioner attached to his brief a document that is purportedly a copy of a receipt from "Neil's Truck & Retread Center," reflecting that Panhandle purchased various quantities and sizes of used tires and rims for $ 3,747.74. This document, however, was not received into evidence at trial. We are bound by the record made at trial and cannot consider ex parte statements made on brief or attachments submitted with a brief as part of the evidence. Perkins v. Commissioner, 40 T.C. 330, 340 (1963); Rule 143(b). See also Jacobs v. Commissioner, T.C. Memo. 1977-1↩ and cases cited therein. We note, however, that even if we had received this document into evidence at trial, it would not have assisted petitioner in meeting his burden of proof. Respondent did not base any part of his deficiency determination upon a fictitious purchase of used tires from Neil's Truck & Retread Center. None of the 145 vouchers prepared by petitioner, which form the basis of respondent's deficiency determination, reflects that Neil's Truck & Retread Center sold used tires to Panhandle, and none of the checks that Panhandle issued as a result of these 145 vouchers names Neil's Truck & Retread Center as payee.
4. The Omnibus Reconciliation Act of 1986, Pub. L. 99-509, sec. 8002(a), 100 Stat. 1874, 1951, increased the section 6661(a)↩ addition to tax to 25 percent of the underpayment attributable to a substantial understatement for additions to tax assessed after October 21, 1986.